PONDEROSA MOULDINGS, INC., PETITIONER *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket No. 5004–67. Filed October 27, 1969.

Kieran P. Madden (an officer), for the petitioner.
*Gary C. Randall,* for the respondent.

OPINION

SCOTT, *Judge:* Respondent determined a deficiency in petitioner's
income tax for the calendar year 1964 in the amount of $3,385.43. The
only issue for decision is whether petitioner is entitled to an invest-
ment credit with respect to a sprinkler system which it installed in its
woodworking plant in 1964.

All of the facts have been stipulated. Since the stipulation is short
and concise, we will set it forth in full in this opinion.

1. The petitioner is an Oregon corporation, organized and operated under the
laws of the State of Oregon since 1937. The location of the petitioner's present
principal office and the location of its principal office at the time of the filing of
the petition herein was Redmond, Oregon. * * * [A copy of the petitioner's cor-
porate income tax return for the calendar year 1964 was attached as Exhibit
1–A.]

2. During the calendar year 1964, the petitioner installed an overhead sprin-
kler system in its main plant building, sorter building and storage building along
with a pipeline to carry water to the system. It is agreed that the system pro-
tects the continuing operations of the petitioner, but is not absolutely essential to
the operation or maintenance of the buildings. The buildings would be com-
plete as buildings with the sprinkler system. The cost of the system and in-
stallation in 1964 was $37,286.05, and the cost of the pipeline used to supply
water to the system in 1964 was $11,077.25. A total of $48,363.30 was thus in-
vested by the petitioner in the installation of the sprinkler system and related
pipeline.

3. The petitioner since 1937 has been principally concerned with the manu-
facturing of wood mouldings from lumber. In connection with this operation the
plant in which the sprinkler system was installed had equipment that handled
ripping, resawing and moulding of wood into exterior and interior mouldings.

4. No sprinkler system had been installed or maintained by Ponderosa Mould-
ings, Inc., from the inception of its organization in 1937 through 1964. In that
year the installation mentioned above was accomplished. The installation of the
sprinkler system was made not only in the area where the lumber was directly
being manufactured but also in separate buildings where raw materials and the
finished product were being stored. The system is of a type found frequently in
the forest products industry. It is attached in such a manner that the actual
equipment is movable and transferable to another location. Some expense and
injury to the system could result, however.

5. The total insurance cost for Ponderosa Mouldings for 1964 is agreed to
have been $4,459.00. The parties also agree that had the sprinkler system not

been installed, the 1964 premium cost for the same insurance would have been $22,056.00. An analysis of the rates for various components of the insurance premiums are set forth below, dividing premiums into "with sprinkler" and "without sprinkler" system categories:

Comparison of 1964 Insurance Premiums

| Insured item | Without sprinkling system | With sprinklers |
|---|---|---|
| Inventory $600,000.00 | $5, 688. 00 | $2, 952. 00 |
| Buildings and equipment | 11, 016. 00 | 1, 003. 00 |
| Replacement insurance | 480. 00 | 86. 00 |
| Business Interruption | 4, 872. 00 | 418. 00 |
| Total premiums | 22, 056. 00 | 4, 459. 00 |

6. The sprinkler system was installed in all portions of the Ponderosa Mouldings operation, consisting of the building in which the actual manufacturing was done, nearby storage sheds, an attached office building, and a sorting shed. Approximately 59% of the total footage of the sprinkler system was installed in the area where the actual manufacturing was done and finished inventory stored. Approximately 7% of the sprinkler system was installed in the building where the office is attached and approximately 34% was installed in the building where raw materials were stored and sorted. There were 4 buildings in the Ponderosa Mouldings operations in 1964 with the building in which the manufacturing was carried on having a value in 1964 of $111,780.00 and the other buildings having a total value of $52,124.00. Equipment in the various portions of the Ponderosa Mouldings operation with a $171,805.00 value actually was used in the woodworking process and other equipment with a $32,939.00 value was used for stacking, sorting, or storage of both inventory and raw materials.

7. It has been difficult for independent insurance agents to place insurance coverage for manufacturers in the woodworking industry. It is agreed that it has been considerably easier to place such coverage where sprinkler systems have been installed. One company, Northwest Mutual Company of Seattle, Washington no longer covers lumber operations. Northwestern Mutual was one of the petitioner's principal carriers.

8. The diagram of the Ponderosa operations in 1964, showing the various plant buildings, their uses, and the sprinkler system installations, is marked as Exhibit 2–B.

The diagram marked Exhibit 2–B shows the location of the factory and office which is attached thereto in which the sprinkler system was installed and the location of the storage shed and sorting shed in which the sprinkler system was installed which are not attached to the factory building.

The parties at the trial orally stipulated that since the installation of the sprinkler system in 1964, part of the sprinkler part of the system has been moved.

On its Federal income tax return for the calendar year 1964 which was filed with the district director of internal revenue at Portland, Oreg., petitioner claimed an investment credit of $4,682.29.

Respondent in his notice of deficiency disallowed $3,385.43 of this claimed investment credit with the explanation that the credit claimed

in this amount which was with respect to the installation of a sprinkler system was disallowed since "you have not shown such sprinkler system qualifies for the investment credit."

Respondent takes the position that the sprinkler system is a "structural component" of the buildings to which it was attached and therefore under the provision of section 48, I.R.C. 1954,[1] is not "Section 38 property" for which an investment credit is provided in section 38(a).[2] Respondent points out that section 1.48–1(e)(2), Income Tax Regs.,[3] which defines the term "structural components" specifically, includes as coming within that terminology a sprinkler system.

[1] All references are to the Internal Revenue Code of 1954.
SEC. 48. DEFINITIONS; SPECIAL RULES.
    (a) SECTION 38 PROPERTY.—
        (1) IN GENERAL.—Except as provided in this subsection, the term "section 38 property" means—
            (A) tangible personal property, or
            (B) other tangible property (not including a building and its structural components) but only, if such property—
[2] SEC. 38. INVESTMENT IN CERTAIN DEPRECIABLE PROPERTY.
    (a) GENERAL RULE.—There shall be allowed, as a credit against the tax imposed by this chapter, the amount determined under subpart B of this part.
    (b) REGULATIONS.—The Secretary or his delegate shall prescribe such regulations as may be necessary to carry out the purposes of this section and subpart B.
[3] Sec. 1.48–1(e). *Definition of building and structural components.* (1) Buildings and structural components thereof do not qualify as section 38 property. The term "building" generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof, the purpose of which is, for example, to provide shelter or housing, or to provide working, office, parking, display, or sales space. The term includes, for example, structures such as apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores. Such term includes any such structure constructed by, or for, a lessee even if such structure must be removed, or ownership of such structure reverts to the lessor, at the termination of the lease. Such term does not include (i) a structure which is essentially an item of machinery or equipment, or (ii) an enclosure which is so closely combined with the machinery or equipment which it supports, houses, or serves that it must be replaced, retired, or abandoned contemporaneously with such machinery or equipment, and which is depreciated over the life of such machinery or equipment. Thus, the term "building" does not include such structures as oil and gas storage tanks, grain storage bins, silos, fractionating towers, blast furnaces, coke ovens, brick kilns, and coal tipples.
    (2) The term "structural components" includes such parts of a building as walls, partitions, floors, and ceilings, as well as any permanent coverings therefor such as paneling or tiling; windows and doors; all components (whether in, on, or adjacent to the building) of a central air conditioning or heating system, including motors, compressors, pipes and ducts; plumbing and plumbing fixtures, such as sinks and bathtubs; electric wiring and lighting fixtures; chimneys; stairs, escalators, and elevators, including all components thereof; sprinkler systems; fire escapes; and other components relating to the operation or maintenance of a building. However, the term "structural components" does not include machinery the sole justification for the installation of which is the fact that such machinery is required to meet temperature or humidity requirements which are essential for the operation of other machinery or the processing of materials or foodstuffs. Machinery may meet the "sole justification" test provided by the preceding sentence even though it incidentally provides for the comfort of employees, or serves, to an insubstantial degree, areas where such temperature or humidity requirements are not essential. For example, an air conditioning and humidification system installed in a textile plant in order to maintain the temperature or humidity within a narrow optimum range which is critical in processing particular types of yarn or cloth is not included within the term "structural components". For special rules with respect to an elevator, or escalator, the construction, reconstruction, or erection of which is completed by the taxpayer after June 30, 1963, or which is acquired after June 30, 1963, and the original use of which commences with the taxpayer and commences after such date, see section 48(a)(1)(C) and paragraph (m) of this section.

Petitioner does not take the position that respondent's regulation is invalid but argues that the sprinkler system put into its building is necessary to its operation and is an integral part of its manufacturing and production activities. Petitioner says that for this reason its sprinkler system should be considered to be tangible personal property other than a structural component of a building within the definition of respondent's regulations. It is petitioner's position that because of the fire hazard in the manufacture of wood mouldings, its sprinkler system should be considered as in effect machinery necessary to its operation and not as a structural component which is a part of the operation or maintenance of the building. Petitioner points out that the term "tangible personal property" as used in section 48 is not intended to be narrowly defined nor to be controlled by the rule of State law, calling attention to the statement in S. Rept. No. 1881, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 722, to this effect. Petitioner also relies on *Northville Dock Corp.*, 52 T.C. 68 (1969), for the proposition that the provisions regarding investment credit should be given a liberal interpretation.

Respondent does not contend that whether an item is tangible personal property or a structural component of a building should be determined by State law but agrees with petitioner that it should not. It is respondent's position that the stipulated facts in this case show that the sprinkler system was intended to and did relate to the operation and maintenance of the building, that it was installed not only in the plant but also in the office building, and that it is of the same nature as items such as central air-conditioning systems, plumbing, and electrical wiring and fixtures relating to the operation and maintenance of a building which were given as examples of structural components in H. Rept. No. 1447, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 503, 515.

Respondent also argues that a sprinkler system such as that installed by petitioner is specifically included as a structural component in his regulations and contends that these regulations are "entitled to great weight in interpreting the statutory definition of section 38 property." *Robert E. Catron*, 50 T.C. 306 (1968). Respondent further calls attention to the fact that after the promulgation of these regulations Congress amended the law to make certain allowances of investment credit in connection with the installation of elevators and escalators. The committee reports in connection with the proposed change in the law specifically referred to the regulations defining the term "struc-

tural component" as "an accurate interpretation of the intention of Congress." [4]

In view of the fact that a sprinkler system installed throughout a building is comparable to the items which the committee reports give as examples of structural components, we consider respondent's inclusion of this item in his regulations as a structural component to be a proper interpretation of the statute. Furthermore, we consider the regulations including this item as a structural component to be in accord with the general intent of the statute providing for an investment credit which was stated in H. Rept. No. 1447, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 411, to place a greater emphasis on equipment and machinery because "it is believed the need for such investments is the major requirement of the economy."

We therefore sustain respondent in his disallowance of petitioner's claimed investment credit with respect to its sprinkler system.

*Decision will be entered for respondent.*

---

[4] In his reply brief, respondent quotes the following from H. Rept. No. 749, 88th Cong., 1st Sess. (1964), 1964–1 (Part 2) C.B. 159–160:

"A third problem arises with respect to the treatment of escalators and elevators in the case of the investment credit. Among the categories of property not eligible for the investment credit are buildings and their structural components. The House committee report indicated that the term "structural components" of a building included such parts of a building as central air conditioning and heating systems, plumbing, and electrical wiring and lighting fixtures relating to the operation and maintenance of the building. The proposed regulations issued by the Treasury Department with respect to the term "structural components" provide an extensive list of the type of items considered to be structural components and therefore not eligible for the investment credit. Among these items are escalators and elevators. While these regulations are an accurate interpretation of the intention of Congress last year in this respect, nevertheless your committee believes that it is appropriate to reconsider the treatment of escalators and elevators for purposes of the investment credit. Escalators and elevators are closely akin to assets "accessory to the operation" of a business which presently are eligible for the investment credit. These assets include machinery, printing presses, transportation or office equipment, refrigerators, individual air-conditioning units, grocery counters, etc. Your committee further believes that new elevator and escalator equipment represents an important aspect of modernization of plant and facilities."