**SHERLEY–ANDERSON–RHEA ELEVATOR, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**SHERLEY–ANDERSON–LAZBUDDIE ELEVATOR, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**PITMAN GRAIN COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. Nos. CA–3–2911, CA–3–2912 and CA–3–3116.

United States District Court, N. D. Texas, Dallas Division.

June 19, 1970.

Sam G. Winstead and William D. Jordan, Dallas, Tex., for plaintiffs.

Howard Weinberger and Daniel L. Penner, U. S. Dept. of Justice, Fort Worth, Tex., for defendants.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

HUGHES, District Judge.

The above-entitled actions came on for trial before the Court, no jury having been demanded, and the cases, in accordance with the agreement of the parties, were submitted to the Court upon Complaint and Answer, Stipulations of Fact, Depositions, and Original and Reply Briefs. Having considered the foregoing

and being fully informed in the premises, the Court, after due deliberation, makes the following findings of fact and conclusions of law under Rule 52(a), F.R. Civ.P.

## FINDINGS OF FACT

1. These are consolidated actions brought by the respective plaintiffs Sherley-Anderson-Rhea Elevator, Inc., Sherley-Anderson-Lazbuddie Elevator, Inc., and Pitman Grain Company, for the recovery of federal income taxes and interest paid by them to the defendant. The only issue is whether the grain storage facilities of Plaintiffs are eligible for the investment credit under Section 38, Internal Revenue Code of 1954. The amount of the refunds, if the credit is available, has been stipulated.

2. The Court adopts the stipulations of fact agreed to by the parties and filed among the papers of this cause.

3. The Plaintiff in CA–3–2911, Sherley-Anderson-Rhea Elevator, Inc., is a Texas corporation whose principal place of business is at Route 2, Friona, Parmer County, Texas. In its taxable year ending August 31, 1964, this Plaintiff constructed and placed in service a grain storage facility with a capacity of approximately 575,000 bushels of grain. This facility is a multistory structure made of concrete and also includes two steel tanks adjacent to the concrete structure. The concrete structure consists of eight concrete tanks, each one-hundred-forty-five feet in height with a diameter of twenty-five feet. It has a complete aeration system. The facility is located in a farming community near Friona, Texas, and is depreciable and has a useful life of eight years or more.

4. The Plaintiff in CA–3–2912, Sherley-Anderson-Lazbuddie, Inc., is a Texas corporation whose principal place of business is in Lazbuddie, Parmer County, Texas. In its taxable year ending February 28, 1963, this Plaintiff constructed and placed in service a grain storage facility with a capacity of approximately 490,000 bushels of grain. This facility is a multistory structure made of concrete with eight tanks and with an aeration system. The facility is located in a farming community near Lazbuddie, Texas. In its taxable year ending February 29, 1964, Plaintiff constructed and placed in service an addition to this grain storage facility consisting of eight multistory concrete tanks with an aeration system. This addition to the structure increased the capacity of the facility to 1,040,000 bushels. The concrete tanks at this facility are each one-hundred-forty-five feet in height, and some tanks have a diameter of twenty-four feet and the others a diameter of twenty-five feet. Both the original facility and the addition to it are depreciable and have useful lives of eight years or more.

5. The Plaintiff in CA–3–3117, Pitman Grain Co., is a Texas corporation whose principal place of business is in Hereford, Deaf Smith County, Texas. In its taxable year ending May 31, 1966, this Plaintiff acquired and placed in service two grain storage facilities and related items. One facility, at Centerpoint, Texas, consisted of a 100' x 200' flat storage facility with overhead bins and a pit house, with a capacity of approximately 495,000 bushels of grain and with a complete aeration system. The other facility, at Sims, Texas, consisted of two upright 18' x 64' steel tanks with a capacity of 14,000 bushels, overhead bins, pit house, roadway, and gas and water lines and with no aeration system, as such, at the time in question. Both facilities are depreciable and have useful lives of eight years or more.

6. All of these facilities are located in rural farming areas in the Texas Panhandle, the nearest sizable town being Hereford, Texas. The facilities are not located on railroad lines. They were built in these areas at the requests of both the producing farmers and the users of the milo and wheat stored in the facilities.

7. Wheat and milo are the principal crops stored in these facilities, and milo makes up from about 70% to 83% of the business. There is a small amount

of barley and soybeans, and a very small amount of corn, stored there on occasion. The wheat is harvested in June and is brought in to these storage facilities at that time. The milo is harvested in October and November and is brought in at that time. All of these crops will be referred to under the general term "grain" unless otherwise stated. All of the grain is produced by the farmer and brought to the facilities in bulk by the farmer; the Plaintiffs produce no grain themselves, nor do they provide equipment with which the farmer produces the grain. When the grain is brought in, it is weighed and the farmer is given a receipt for the grain. Then the grain is transferred into the facility, either by conveyor belt, dumping, or otherwise. The grain is then stored in bulk in the facility; there is no segregation of the grain unless the farmer specifically requests it, such as for seed wheat, but this is rare. The grain is brought to the storage facilities by the producers, who provide their own transportation, and is taken away by the users, who provide their own transportation.

8. When the grain comes in, it goes on storage for the account of the farmer. Virtually all of it goes on farmer-account storage for some period of time. The farmer makes the decision on the disposition of the grain credited to his account. He has numerous choices, including: he can store it as long as he wants; he can withdraw it himself for use in feeding his livestock or for sale by him to another party; he can sell the grain to the Plaintiffs, who, in turn, will customarily sell it; or he can sell the stored grain himself to a third party who then becomes the owner and will pay storage fees until he withdraws it. Plaintiffs customarily sell the wheat they buy to a flour mill or for export, and the milo primarily to area feed lots for cattle feeding, but some milo is sold for shipment out of state. Grain is transferred out of the facilities in bulk, and the farmer or the third party buyer picks up his grain at the facility. The farmer's decision and timing on when and whether to sell varies with the financial condition of the farmer and with how good a farming year he had. Some grain is stored by the farmer for his account for a number of months, and some for as long as a year. Customarily, the farmer will eventually sell about ninety percent of the stored grain to the Plaintiffs at some time, and the Plaintiffs will then sell it to third parties, all the while either directly charging for storage or indirectly charging for storage by reducing the amount paid by Plaintiffs to the farmer or increasing the selling price to the third party purchaser.

9. Storage income from these facilities during the years involved exceeded income from buying and selling the grain.

10. While stored, the grain is aerated, turned, dried, blended, kept within a temperature range, and sprayed with insecticides and pesticides. All the facilities except Sims had complete aeration systems made up of air ducts and fans to condition the grain by keeping it cool and by taking out one or two percentage points of moisture. The grain is also moved from bin to bin at Lazbuddie and Rhea, and is turned at Sims. This movement was the method used at Sims to aerate and condition its grain. The aeration systems run, and the turning is done, continuously for two or three months after the grain comes in, and generally after that, less often but as needed. The purpose for keeping the grain cool is to retard spoilage and to prevent or reduce mold and insects. Without aeration or turning, the grain would spoil and be unmarketable and unusable, and a fire by spontaneous combustion could occur if the grain got too much heat. The Lazbuddie and Rhea facilities have "hot spot detectors," which are cables running through each bin which give continuous temperature readings on the grain. At the Centerpoint facility, "core samples" of the grain are taken all over the facility to determine temperature and moisture. All of the grain is aerated, unless it is sold to

someone when it comes in and is immediately shipped out. Insecticides such as malathion for milo and cyanide gas for wheat are sprayed on the grain to eliminate weevils and insects.

11. Some grain comes in at, for example, seventeen percent moisture, and some at thirteen or fourteen percent moisture. The moisture content would average fourteen-and-one-half to fifteen percent. The amount of moisture in the grain varies with such things as the rainfall for the year and time delay from harvesting to storage. Another purpose of the aeration and turning is to blend grains together which have different moisture contents in order to keep the grain conditioned better and to obtain grain with the amount of moisture which a purchaser or user requires. Milo is sold usually at fourteen percent moisture and wheat at about thirteen-and-one-half percent moisture. Since the grain is sold by weight, the Plaintiffs, if it is their grain, will, of course, attempt to sell it at, or just under, the moisture content specified by the purchaser. The Plaintiffs grade the grain when it comes in, and when it is sold, the ordinary procedure is for it to be graded by U. S. inspectors.

12. The Defendant has allowed the investment credit claimed by Plaintiffs on certain machinery installed in these facilities for the appropriate years. The Plaintiffs have also claimed the investment credit on the remaining cost of these facilities, but the Defendant has rejected these claims.

13. Considering all of the aspects of the operations of the grain storage facilities of the Plaintiffs, the facilities are tangible property which are storage facilities used in connection with manufacturing and production.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the subject matter and of the parties to these consolidated actions.

2. Considering all of the aspects of the operations of the grain storage facilities of the Plaintiffs, the facilities are tangible property which are storage facilities used in connection with manufacturing and production as those terms are defined in Internal Revenue Code section 48 and in Treasury Regulations section 1.48–1(d). The facilities meet the other requirements of Code section 48 and qualify for the investment credit allowed by Code sections 38 and 46. Commissioner of Internal Revenue v. Schuyler Grain Co., Inc., 411 F.2d 649 (7th Cir. 1969), affirming 50 T.C. 265 (1968); Northville Dock Corp. v. Commissioner of Internal Revenue, 427 F.2d 164 (2nd Cir. 1970), affirming 52 T.C. 68 (1969); and United States v. Loami Grain Co., Inc., (D.C.Ill.1969), (69–2 CCH U.S.Tax Cas. ¶ 9543).

3. The "predominant use" test urged by the Defendant for determining whether the facility is used in connection with a qualifying activity has no basis in either the Code sections providing for the investment credit or the regulations thereunder. The owner of the facility is not required to be in the farming business himself in order to qualify. Reg. §§ 1.48–1(d) (2) and –1(d) (5). The distinctions made by the Internal Revenue Service in Rev. Ruls. 68–122, 1968–1 Cum.Bull. 10, 68–132, 1968–1 Cum.Bull. 14, and 67–220, 1967–2 Cum.Bull. 46, have been expressly disapproved in Schuyler Grain Co., supra, and in Northville Dock Corp., supra, and are disapproved here. In any event, even if some "use" test were proper, since the Plaintiffs' income from grain storage for farmers actually exceeded their income from buying and selling the grain, the Plaintiffs' facilities are used primarily for storage of grain in connection with manufacturing and production and therefore qualify for the investment credit.

## JUDGMENT

The above-entitled action came on for trial before the Court, no jury having been demanded, and the case, in accordance with the agreement of the parties, was submitted to the Court upon Complaint and Answer, Stipulations of Fact,

Depositions, and Original and Reply Briefs. The Court is of the opinion, and it is, therefore, ordered, adjudged and decreed, that Plaintiff, Sherley-Anderson-Rhea Elevator, Inc., be awarded judgment of $14,636.78 plus interest on such amount at the rate of 6% per annum as provided by law.

The above-entitled action came on for trial before the Court, no jury having been demanded, and the case, in accordance with the agreement of the parties, was submitted to the Court upon Complaint and Answer, Stipulations of Fact, Depositions, and Original and Reply Briefs. The Court is of the opinion, and it is, therefore, ordered, adjudged and decreed, that Plaintiff, Sherley-Anderson-Lazbuddie Elevator, Inc., be awarded judgment of $25,214.55 plus interest on such amount at the rate of 6% per annum as provided by law.

The above-entitled action came on for trial before the Court, no jury having been demanded, and the case, in accordance with the agreement of the parties, was submitted to the Court upon Complaint and Answer, Stipulations of Fact, Depositions, and Original and Reply Briefs. The Court is of the opinion, and it is, therefore, ordered, adjudged and decreed, that Plaintiff, Pitman Grain Co., be awarded judgment of $7,788.89 plus interest on such amount at the rate of 6% per annum as provided by law.