**ILLINOIS CEREAL MILLS, INC., Appellee,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellant.**

No. 85–1485.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 25, 1985.

Decided April 28, 1986.*

---

* This opinion has been circulated among all judges of this court in regular active service under Circuit Rule 16 on the question of creat-ing a conflict with *A.C. Monk & Co. v. United States,* 686 F.2d 1058 (4th Cir.1982). No judge voted to hear this case *en banc.*

William A. Whitledge, Dept. of Justice, Tax Div., Washington, D.C., for Commissioner.

David J. Duez, McDermott, Will & Emery, Springfield, Ill., for ICM.

Before BAUER, WOOD and ESCHBACH, Circuit Judges.

BAUER, Circuit Judge.

This is an appeal by the Commissioner of Internal Revenue from a decision of the United States Tax Court. The Commissioner argues the Tax Court erred in holding that ninety-five percent of the cost of Illinois Cereal Mill's factory electrical system qualified for the investment tax credit. We affirm.

## I.

Illinois Cereal Mills ("ICM") conducts a corn milling business in Paris, Illinois. In 1976, ICM completed construction of a new speciality mill. The electrical distribution system that provides power to the specialty mill is contained in a separate room within the mill building. The system consists of circuit breakers, transformers, power panels, switchboards, motor control centers, and associated wiring. It functions to break down the 4,160 volts received from the electric utility into voltages usable in the mill. Ninety-five percent of the electrical load entering the system is used to run mill machinery. The remaining five percent is used for lighting and other general building needs.

In its tax return filed for its fiscal year ending September 30, 1976, ICM treated

the entire cost of the electrical system as an expenditure qualifying for the investment tax credit. The Commissioner determined that none of the cost qualified and claimed a deficiency on that basis. The Tax Court held that ninety-five percent of the cost of the electrical distribution system qualified for the investment tax credit because ninety-five percent of its function was to supply usable power to mill machinery qualifying for the investment tax credit. The Commissioner appeals. We affirm.

## II.

This case concerns the investment tax credit ("ITC"). The ITC was added to the Internal Revenue Code in 1962. Pub.L. 87–834, 76 Stat. 967 (1962). It is designed to increase economic productivity, output, and growth by creating a tax incentive for the purchase of machinery, equipment, and other property used to produce goods or run a business. *Comdisco v. United States*, 756 F.2d 569, 572 (7th Cir.1985); *CIR v. Schuyler Grain Co.*, 411 F.2d 649, 652 (7th Cir.1969); *See*, H.R.Rep. No. 1447, 87th Cong., 2d Sess. 11 (1962); S.Rep. No. 1881, 87th Cong., 2d Sess. 11 (1962).

The ITC is established in § 38 of the Internal Revenue Code. To qualify for ITC treatment, property must meet the definition of "section 38 property" found at § 48 of the Code. In 1976, the relevant tax year for this appeal, § 48 read in pertinent part as follows.

§ 48. Definitions; special rules

(a) Section 38 property—

(1) In general.—Except as provided in this subsection, the term "section 38 property" means—

(A) tangible personal property, or

(B) other tangible property (not including a building and its structural components). . . .

26 U.S.C. § 48(a)(1) (1976). Thus, the Code establishes two ways for property to qualify as ITC property: (1) by meeting the definition of "tangible personal property" or (2) by meeting the definition of "other tangible property" and qualifying as something other than a building or structural component of a building.

The labyrinthian analysis developed in the statute, regulations, cases, and legislative history to determine whether property qualifies as "tangible personal property" or "other personal property" (and thus as § 38 property given ITC treatment) is a meandering path of many steps. We first chart the course, then venture down it with the facts of this case in tow.

## A.

The test for "tangible personal property" focuses on whether the property in question is an "inherently permanent structure." Treas.Reg. § 1.48–1(c) (26 C.F.R.); H.R.Rep. No. 1447, 87th Cong., 2d Sess. 11–12 (1962); S.Rep. No. 1881, 87th Cong., 2d Sess. 11–12 and 16 (1962). Thus cases and Treasury rulings have determined that property that is easily removable, such that it is likely to accompany the business if it should leave the premises, is § 38 property and qualifies for the ITC.[1]

---

1. *Consolidated Freightways v. Commissioner of Internal Revenue*, 708 F.2d 1385, 1390 (9th Cir. 1983) (loading docks, overhead doors, and lights are intended to be permanent and thus do not qualify as § 38 property); *Southland Corp. v. United States*, 222 Ct.Cl. 22, 611 F.2d 348 (1979) (outdoor advertising signs are § 38 property to extent removable); *Kramertown Co. v. Commissioner of Internal Revenue*, 488 F.2d 728, 731 (5th Cir.1974) (air conditioning/heating units, removable only to extent necessary for replacement and repair, are not § 38 property); *National Advertising Co. v. United States*, 205 Ct.Cl. 728, 507 F.2d 850 (1974) (outdoor advertising signs are § 38 property to extent removable); *Alabama Displays v. United States*, 205 Ct.Cl.

716, 507 F.2d 844 (1974) (same); *King Radio Corp. v. United States*, 486 F.2d 1091 (10th Cir. 1973) (movable partitions are § 38 property under permanency test); *Minot Federal Savings and Loan Association v. United States*, 435 F.2d 1368 (8th Cir.1970) (same); *Hayden Island v. United States*, 380 F.Supp. 96, 98 (D.Or.1974) (sewage treatment plant movable from site to site qualifies as § 38 property under permanency test); *Samis v. Commissioner of Internal Revenue*, 76 T.C. 609, 620–21 (1981) (heating, air conditioning, and hot/cold water unit is not § 38 property under permanency test); *Standard Oil Co. (Indiana) v. Commissioner of Internal Revenue*, 77 T.C. 349, 404–09 (1981) (outdoor advertising signs are § 38 property to ex-

If property fails to qualify as tangible personal property under § 38 because that property is found to be inherently permanent, all is not lost for the taxpayer. Such property may still qualify as § 38 property under the test for "other tangible property." Congress added this separate category to insure that some property classified as non-personal under state law (such as, heavy immovable machines classified as fixtures and, therefore, technically real property) would still qualify for the ITC. *Kramertown Co. v. Commissioner of Internal Revenue*, 488 F.2d 728, 731 (5th Cir.1974); H.R.Rep. No. 1447, 87th Cong., 2d Sess. 11–12 (1962); S.Rep. No. 1881, 87th Cong., 2d Sess. 16 (1962).

■ The test for "other tangible property" has three distinct components. First, property must qualify initially as tangible property of the type intended by Congress to be covered. Second, it must not be a building. Third, it must not be a structural component of a building.

■ Congress intended to allow ITC treatment of property, even if that property is "inherently permanent," if the property relates to the taxpayer's specific business rather than being generally adaptable to most commercial uses. As the Senate report phrased it, Congress wanted to allow ITC treatment of "[a]ssets accessory to the operation of a business." S.Rep. No. 1881, 87th Cong., 2d Sess. 11–12 (1962). Examples of ITC property cited in the Senate report and incorporated into the regulations include "machinery, printing presses, transportation or office equipment, refrigerators, individual air-conditioning units, grocery counters, testing equipment, display racks and shelves, etc." *Id.;* Treas. Reg. § 1.48–1(c). Cases and Treasury rulings have established other examples.[2]

tent removable); *Scott Paper v. Commissioner of Internal Revenue*, 74 T.C. 137, 172 (1980) (pri electrical system is movable, therefore, not inherently permanent); *Whiteco Industries v. Commissioner of Internal Revenue*, 65 T.C. 664 (1975) (outdoor advertising signs are § 38 property to extent removable); *Weirick v. Commissioner of Internal Revenue*, 62 T.C. 446, 455–56 (1974) (earthen ski ramps are permanent and thus not § 38 property, while wooden ski ramps are removable and qualify as § 38 property); *Roberts v. Commissioner of Internal Revenue*, 60 T.C. 861 (1973) (Astro Needle amusement ride not personal property under § 38 because inherently permanent); *Everhart v. Commissioner of Internal Revenue*, 61 T.C. 328, 330 (1973) (sewage disposal system not § 38 property because not removable); *Moore v. Commissioner of Internal Revenue*, 58 T.C. 1045 (1972), *aff'd,* 489 F.2d 285 (5th Cir.1973) (house trailers are personal property under § 48 as to trailer park owner since removable); *Estate of Morgan v. Commissioner of Internal Revenue*, 52 T.C. 478 (1969), *aff'd per curiam,* 448 F.2d 1397 (9th Cir.1971) (floating docks qualify as "tangible personal property" under § 38 because removable, while permanent pilings do not); Rev.Rul. 67–349, 1967–2 Cum. Bull. 48 (wall-to-wall carpeting in motel rooms is § 38 property because not permanently installed).

2. *A.C. Monk & Co. v. United States*, 686 F.2d 1058, 1064–66 (4th Cir.1982) (generally adaptable electrical equipment not § 38 property); *Consolidated Freightways v. United States*, 223 Ct.Cl. 443, 620 F.2d 862, 874 (1980) (docking platform is not § 38 property because not generally adaptable); *Brown-Forman Distillers Corp.*

*v. United States*, 205 Ct.Cl. 402, 499 F.2d 1263, 1269 and 1272–73 (1974) (equipment specially designed for maturing whiskey qualifies as § 38 property); *Dock Corp. v. Commissioner of Internal Revenue*, 52 T.C. 68 (1968) *aff'med.* 427 F.2d 164 (2d Cir.1970) (oil storage tanks are § 38 property); *Commissioner of Internal Revenue v. Schuyler Grain*, 411 F.2d 649, 651–52 (7th Cir. 1969) (concrete grain storage bins are § 38 property because specially designed for aerating and drying); *Stuppy, Inc. v. United States*, 454 F.Supp. 1378, 1384 (W.D.Mo.1978) (speciality greenhouse is § 38 property because not generally adaptable); *Yellow Freight Systems v. United States*, 413 F.Supp. 357 (W.D.Mo.1975), *rev'd. in part on other grounds,* 538 F.2d 790 (8th Cir.1976) (fence around freight yard is § 38 property since especially necessary to protect bailee's property); *Brown & Williamson Tobacco Corp. v. United States*, 369 F.Supp. 1283, 1288 (W.D.Ky.1973), *aff'd per curiam,* 491 F.2d 1258 (6th Cir.1974) (tobacco storage sheds are § 38 property because not generally adaptable); *F.P. Wood & Son of Elizabeth City v. United States*, 314 F.Supp. 1205 (E.D.N.C.1970) (special grain storage facilities are § 38 property); *Sherley-Anderson-Rhea Elevator v. United States*, 315 F.Supp. 1055, 1058 (N.D.Tex.1970) (same); *Noell v. Commissioner of Internal Revenue*, 66 T.C. 718, 729 (1976) (airport runways are § 38 property even though permanent); *Spartanburg Terminal Co. v. Commissioner of Internal Revenue*, 66 T.C. 916, 938–40 (1976) (fence around railroad tunnel is § 38 property); *Weirick v. United States*, 62 T.C. 446, 451–54 (1974) (ski lift towers are § 38 property even though permanently in-

■ Property that qualifies initially as the type of "other property" intended by Congress must also qualify as something other than a building. The test for whether property is a building focuses on the appearance of the property, whether the property functions as a building (such as by providing everyday working space), and, if the property is a structure housing other property, whether that structure is closely related to the property it houses.[3] The courts have applied these factors to determine whether property is a building.[4]

stalled because special equipment accessory to taxpayer's business); *Merchants Refrigeratoring Co. of Cal. v. Commissioner of Internal Revenue,* 60 T.C. 856 (1973) (specialized freezer room is § 38 property); *Central Citrus Co. v. Commissioner of Internal Revenue,* 58 T.C. 365 (1972) (blowers and coolers necessary to meet temperature and humidity requirements of food processing and "sweet rooms" used to ripen fruit are specialized and, therefore, § 38 property while electrical appliances used in general plant operation are not specialized and do not qualify); *Ponderosa Mouldings v. Commissioner of Internal Revenue,* 53 T.C. 92 (1969) (sprinkler system not § 38 property because not accessory to business even though taxpayer's wood moulding business particularly prone to fire); Rev. Rul. 79–183, 1979–1 C.B. 44 (special heavy equipment footings are § 38 property even though functional as flooring or as lighter duty footings); Rev.Rul. 79–181, 1979–1 C.B. 41 (special high-stress columns are § 38 property because designed to take abnormal stress from heavy equipment); Rev.Rul. 70–103, 1970–1 Cum.Bull 6 (fuel tanks, diesel generator, and exhaust equipment are specialized § 38 property); Rev.Rul. 69–602, 1969–2 Cum.Bull. 6 (propane tanks are specialized § 38 property); Rev. Rul. 65–79, 1965–1 Cum. Bull. 26 (bank vault doors and drive-up window are specialized § 38 property accessory to taxpayer's business).

3. These factors are drawn from the legislative history and regulations.

> The term "building" is to be given its commonly accepted meaning, that is, a structure or edifice enclosing a space within its walls, and usually covered by a roof. It is the basic structure of an improvement to land the purpose of which is, for example, to provide shelter or housing or to provide working, office, display, or sales space.

S. Rep. No. 1881, 87th Cong., 2d Sess. 11–12 (1962).

> The term "building" generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof, the purpose of which is, for example, to provide shelter or housing, or to provide working, office, parking, display, or sales space.... Such term does not include (i) a structure which is essentially an item of machinery or equipment, or (ii) a structure which houses property used as an integral part of [a qualified use] if the use of the structure is so closely related to the use of such property that

the structure clearly can be expected to be replaced when the property it initially houses is replaced. Factors which indicate that a structure is closely related to the use of the property it houses include the fact that the structure is specifically designed to provide for the stress and other demands of such property and the fact that the structure could not be economically used for other purposes. Treas. Reg. § 1.48–1(e) (26 C.F.R.).

4. *Tamura v. United States,* 734 F.2d 470, 471–73 (9th Cir.1984) (pre-fabricated structures used to store onions are buildings because not closely related to stored property); *Consolidated Freightways v. Commissioner of Internal Revenue,* 708 F.2d 1385, 1386–89 (9th Cir.1983) (truck loading docks are buildings because they provide working space); *A.C. Monk & Co. v. United States,* 686 F.2d 1058, 1063–64 (4th Cir. 1982) (railroad dock and tobacco storage and receiving rooms are buildings because of appearance and function); *Consolidated Freightways v. United States,* 223 Ct.Cl. 443, 620 F.2d 862, 869–73 (1980) (docking facilities are buildings by appearance and function); *Yellow Freight System v. United States,* 538 F.2d 790 (8th Cir.1976) (freight docks and inspection lanes are buildings by appearance and function); *Thirup v. Commissioner of Internal Revenue,* 508 F.2d 915 (9th Cir.1974) (greenhouse is not a building by function); *Brown-Forman Distillers v. United States,* 205 Ct.Cl. 402, 499 F.2d 1263, 1269–72 (1974) (whiskey maturation facilities are not buildings based on function); *Stuppy, Inc. v. United States,* 454 F.Supp. 1378 (W.D. Mo.1978) (speciality greenhouse is not a building by appearance and function and because it is closely related to stored property); *Starr Farms v. United States,* 447 F.Supp. 580 (W.D. Ark.1977) (structures used to house chickens are buildings because of appearance and because they are not closely related to stored property); *Endres Floral Co. v. United States,* 450 F.Supp. 16 (N.D.Ohio 1977) (non-specialty greenhouse is a building by appearance and function and because it is not closely related to stored property); *Brown & Williamson Tobacco Corp. v. United States,* 369 F.Supp. 1283 (W.D.Ky.1973), *aff'd per curiam,* 491 F.2d 1258 (6th Cir.1974) (tobacco drying sheds are not buildings because they provide only incidental working space); *Valmont Industries v. Commissioner of Internal Revenue,* 73 T.C. 1059, 1070–78 (1980) (galvanizing facility is a building by function and appearance); *Satrum v. Commissioner of Internal Rev-*

■ Even if property qualifies as "other property" and is not a building, it still may not be § 38 property if it is a structural component of a building. The test for "structural components" set out in the regulations and legislative history focuses on whether the property in question is property "relating to the operation and maintenance of a building." Treas.Reg. § 1.48–1(e)(2) (26 C.F.R.); S.Rep. No. 1881, 87th Cong., 2d Sess. 11–12 (1962). Thus, if property relates to building operation and maintenance, it is a structural component not qualifying for ITC treatment.[5] The courts have applied this analysis in determining whether property is a "structural component." [6]

### B.

■ We now turn to the task of applying this established law to the facts of this case. We keep in mind that the ITC should be construed liberally in light of its purposes, *Comdisco v. United States*, 756 F.2d 569, 577 (7th Cir.1985); *Commissioner of*

*Internal Revenue v. Schuyler Grain Co.*, 411 F.2d 649, 652 (7th Cir.1969), and that the purpose of the ITC is to promote investment. *Comdisco* at 572–73; *Schuyler Grain* at 652. The burden is on ICM, however, to prove it is entitled to the ITC. *Lockhart Leasing Co. v. United States*, 446 F.2d 269, 271 (10th Cir.1971).

ICM does not contend that its electrical distribution system is "tangible personal property" under § 48. The components of the system are not easily removable such that ICM would be expected to take them along should it vacate the premises. The system is inherently permanent and only qualifies for ITC treatment if the requirements of "other tangible property" are met.

The primary disagreement between ICM and the Commissioner is over whether the ninety-five percent of ICM's electrical distribution system that powers ICM's equipment is the type of "other tangible property" intended by Congress to be allowed

---

enue, 62 T.C. 413 (1974) (chicken coops are not buildings because no working space is provided); *Merchants Refrigerating Co. of Cal. v. Commissioner of Internal Revenue*, 60 T.C. 856 (1973) (refrigeration room is not a building); *Central Citrus v. Commissioner of Internal Revenue*, 58 T.C. 365, 370–73 (1972) ("sweet rooms" used to ripen fruit are not a building).

5. The regulations then go on to clarify, however, that even if property relates to the operation and maintenance of a building, it may still qualify as § 38 property if it is specially installed to meet particular manufacturing requirements.

The term "structural components" includes such parts of a building as walls, ... electric wiring and lighting fixtures.... and other components relating to the operation and maintenance of a building. However, the term "structural components" does not include machinery the sole justification for the installation of which is the fact that such machinery is required to meet ... requirements which are essential for the operation of other machinery or the processing of materials or foodstuffs. Machinery may meet the "sole justification" test provided by the preceding sentence even though it incidentally provides for the comfort of employees, or serves, to an insubstantial degree, areas where such ... requirements are not essential.
Treas. Reg. § 1.48–1(e)(2) (26 C.F.R.).

6. *Consolidated Freightways v. Commissioner of Internal Revenue*, 708 F.2d 1385 (9th Cir.1983) (overhead doors on loading dock and lighting fixtures are structural components); *A.C. Monk & Co. v. United States*, 686 F.2d 1058, 1062–63 (4th Cir.1982) (high bay ceiling built to accommodate height of certain machinery is structural component); *Kramertown Co. v. Commissioner of Internal Revenue*, 488 F.2d 728, 729–30 (5th Cir.1974) (air conditioning/heating units are structural components); *Samis v. Commissioner of Internal Revenue*, 76 T.C. 609, 619–20 (1981) (heating, air conditioning and hot/cold water unit is structural component); *Scott Paper Co. v. Commissioner of Internal Revenue*, 74 T.C. 137, 186 (1980) (percentage of primary electrical system allocable to machinery is not structural component); *Spalding v. Commissioner of Internal Revenue*, 66 T.C. 1017, 1020 (1976) (fence around auto salvage yard is not structural component); *Coors v. Commissioner of Internal Revenue*, 60 T.C. 368, 404–05 (1973), aff'd, 519 F.2d 1280 (10th Cir.1975) (air conditioning duct work is structural component); *Central Citrus Co. v. Commissioner of Internal Revenue*, 58 T.C. 365, 373–74 (1972) (blowers and coolers necessary to meet temperature and humidity requirements of food processing are not structural components); *Fort Walton Square v. Commissioner of Internal Revenue*, 54 T.C. 653 (1970) (air conditioning for individual stores in shopping center is a structural component).

ITC treatment. The Commissioner argues that that portion of the system is not an asset accessory to ICM's business because it is generally adaptable to any business utilizing heavy equipment compatible with the voltage output of ICM's system. The Commissioner points out that the components of ICM's electrical distribution system are not custom made specialty items, but rather are common "off-the-shelf" goods. ICM admits that the five percent of the system that supplies power to the building is certainly not accessory to ICM's business and would serve any enterprise that might subsequently occupy the premises, but contends the only reason ninety-five percent of its system was installed was to power ICM's machines. ICM concludes from this that ninety-five percent of its system must be accessory to its business. ICM points out that under the Commissioner's broad adaptability test, even the machines themselves would be disqualified from ITC treatment because they are adaptable to the business of another milling enterprise. Finally, ICM agrees that custom made electrical components would present a clearer case, but argues that ICM's ability to purchase its electrical items from a manufacturer's inventory is otherwise irrelevant to the question of whether the equipment is special equipment accessory to ICM's business.

The question is obviously one of determining how wide to cast the net of adaptability. If we define adaptability as broadly as the Commissioner would like, we would in effect be holding that any equipment that may be usable by a subsequent occupant of the premises, even if that occupant is in the same business as the taxpayer, is adaptable and, therefore, not accessory to the taxpayer's business. This would severely curtail the separate category of "other tangible property." On the other hand, we must be careful to avoid the result tentatively urged by ICM in which any property that is not a building or structural component thereof qualifies as § 38 property. This would completely eliminate any separate requirement that "other tangible property" be accessory to the taxpayer's business.

Viewing ICM's electrical distribution system in light of the regulations, legislative history, and case law, we conclude that the ninety-five percent of that system powering ICM's manufacturing equipment is accessory to ICM's business and is not so generally adaptable that it is disqualified from ITC treatment. The examples cited in the legislative history and regulations make clear that property need not be extraordinarily specialized to qualify for the ITC. Treas.Reg. § 1.48–1(c) (26 C.F.R.) (indicating that "machinery, printing presses, transportation or office equipment, refrigerators, individual air-conditioning units, grocery counters, testing equipment, display racks and shelves" are all accessory to a taxpayer's business and qualify for ITC); S.Rep. No. 1881, 87th Cong., 2d Sess. 11–12 (1962) (same). If grocery counters and display racks are not so generally adaptable that they are disqualified from ITC treatment, we are unable to say that the portion of ICM's electrical distribution system that powers its heavy equipment is disqualified from ITC treatment even if we accept the Commissioner's unsupported claim that ICM's system produces "standard" voltages used by most heavy equipment. We find additional support for this conclusion in the Commissioner's regulatory language suggesting that property that is part of a taxpayer's building requires no separate showing of being accessory to the taxpayer's business. Treas.Reg. § 1.48–1(c) (26 C.F.R.) ("tangible personal property includes all property (other than structural components) which is contained in or attached to a building").

Furthermore, the case of *Scott Paper v. Commissioner of Internal Revenue*, 74 T.C. 137 (1980) seems squarely on point in ICM's favor. The Tax Court below expressly relied on *Scott Paper* to reach its result in this case, and ICM argues that *Scott Paper's* rationale should control. In *Scott Paper,* the Tax Court found that the percentage of the taxpayer's "primary electrical system" used to power machinery

qualified for the ITC while the percentage used for lighting, ventilation, and other building services did not qualify. The primary electrical system involved in *Scott Paper* is apparently the same type of system involved in this case. The court in *Scott Paper* described the system as functioning to reduce the voltage received from the utility to voltages compatible with the machinery and as "comprised of a primary disconnect switch, a transformer, a primary low-voltage breaker, a bus, meters, and distribution or secondary breakers." 74 T.C. at 148. Absent good reason to reject *Scott Paper*, its rationale would require affirmance in this case.

The Commissioner argues that we must reject *Scott Paper* for three reasons. First, the Commissioner urges us to follow the Fourth Circuit which, the Commissioner asserts, rejected *Scott Paper* in *A.C. Monk & Co. v. United States*, 686 F.2d 1058 (4th Cir.1982). Second, the Commissioner alleges that the Tax Court in this case followed *Scott Paper* in applying a "functionality test" which is supposedly now discredited. Finally, the Commissioner asserts that there is no basis in the law to allow allocation of the ITC on a partial or percentage basis as done in *Scott Paper* and below. We find all three of these arguments to be without merit, and see no reason to reject the *Scott Paper* result.

We are not convinced that *Scott Paper* and *A.C. Monk* are fundamentally irreconcilable. To the extent they are, however, we disagree with the reasoning in *Monk* and adhere to *Scott Paper*.

In *Monk*, the court described the electrical system involved as follows:

> The power company provides electricity to the exterior of Monk's factory. Under the system designed and purchased by Monk, the power is split at two "switchgear" panel boards—one supplying power to the factory and the other to the office structure containing laboratory and computer rooms. Power to the factory is conducted by a large, copper bus duct running the length of the factory, designed to be simply tapped to provide power at any location. Tap-ins feed the electricity through several panel boards and transformers to motor control boxes (essentially on-off switches for the machinery). Power for machinery and for the building itself (e.g., lights) comes through the same electrical system. Power to the office flows through a similar system.

*Monk*, 686 F.2d at 1065. The district court in *Monk* followed *Scott Paper* and "allowed as a credit the portion of the system's costs that could be allocated to machinery operations." *Id.* On appeal, the Fourth Circuit rejected the Commissioner's argument that no permanently installed electrical system could qualify for the ITC, but also reversed the district court's allocation. *Id.* The court reversed as error the lower court's use of "a narrow function test (i.e., does the system service machinery?)" and the lower court's "allocating a portion of a single system as structural." *Id.* The court then articulated what it believed to be the proper analysis.

> We believe that the proper approach is, again, to determine whether the system has more general uses than simply operating specific items of machinery. Thus, if the wiring and other components of the electrical system could be adapted to other operations, they are structural components of the building. For example, wiring providing electricity for lighting is certainly a structural component, because lighting is a general need of many manufacturing operations. Similarly, an electrical system providing power to machinery is a structural component if the system can feasibly be adapted to uses other than the specific machine it was designed to serve.
>
> One method of analyzing the issue would be to determine whether a manufacturer converting the building to an alternate process would be able, with reasonable alterations, to use the existing system, or whether he would have essentially to scrap the system and install another. Of course, to be considered a structural component the elec-

trical system need not be adaptable to all conceivable uses, but only flexible enough that it is not inextricably linked to the present, specific machinery.

*Monk,* 686 F.2d at 1065–66. The court then remanded for a determination of which components of the electrical system were generally adaptable and which were not.

*Monk* is fundamentally consistent with our approach and the approach in *Scott Paper.* The *Monk* court recognized that the key inquiry for a permanently installed electrical system is the degree of adaptability or specialization of that system. It also recognized that an electrical system can partially qualify for the ITC.

■ The *Monk* court did appear to reject, however, the *Scott Paper* method of allocating the portion of the electrical system that qualifies for ITC treatment by determining the percentage of that system used to power manufacturing equipment. The *Monk* court preferred a method of looking at each individual component of the system and determining whether that component is itself generally adaptable. To the extent *Monk* disapproves of the *Scott Paper* percentage allocation method, we must reject the reasoning in *Monk.*

The *Monk* court, and the Commissioner in this case, assert that there is "no basis in the legislative history, the regulations or the case law" for allocating ITC treatment to one percentage of property and not to the remaining percentage based on different uses of the property. This is simply wrong. Many courts have specifically allowed ITC treatment by percentage allocation based on use. *Panhandle Eastern Pipe Line Co. v. United States,* 225 Ct.Cl. 113, 654 F.2d 35, 42 (1981) (property is partially disqualified from ITC to extent used for personal or entertainment purposes); *Sherley-Anderson-Rhea Elevator v. United States,* 315 F.Supp. 1055, 1058 (N.D.Tex.1970) (ITC allowed to extent property used for qualified use); *Merchant's Refrigerating Co. of Cal. v. Commissioner of Internal Revenue,* 60 T.C. 856, 860 (1973) (portion of structure used solely for storage is not "building" under § 38 while remainder not so used is building); *Central Citrus v. Commissioner of Internal Revenue,* 58 T.C. 365, 370–73 (1972) (same); *Catron v. Commissioner of Internal Revenue,* 50 T.C. 306 (1968) (same). The legislative history makes clear that percentage allocations of ITC property based on use were expressly contemplated by Congress. In discussing the requirement that § 38 property be depreciable (a requirement not involved in this case), the Senate Committee said the following.

If an asset is in part subject to an allowance for depreciation and in part nondepreciable, only the proportionate part of the asset which is subject to depreciation will qualify as section 38 property. Thus, if an asset is used 80 percent of the time in a trade or business and is used 20 percent of the time for personal purposes, only 80 percent of such property will qualify as section 38 property subject to depreciation. Further, property does not qualify to the extent it is treated as property which is used for personal, living, and family purposes under section 274 (relating to disallowance of certain entertainment, etc., expenses).

S.Rep. No. 1881, 87th Cong., 2d Sess. 11–12 (1962). In the face of this authority, we cannot accept *Monk's* conclusion that percentage allocation of property based on use for ITC purposes is improper.

■ We also reject the Commissioner's attack on what he characterizes as the Tax Court's "functionality test." The Tax Court faced the task of determining what portions of the electrical distribution system are assets accessory to ICM's business. Making this allocation on the basis of the percentage of the system used to power machinery is a sensible approach in accord with the regulations, cases, and legislative history as outlined above.

■ Furthermore, the cases cited by the Commissioner (including *Monk*) do not stand for the proposition that the "functionality test" has been generally rejected.

The Commissioner cites language in *Minot Federal Savings & Loan Association v. United States,* 435 F.2d 1368, 1371 (8th Cir.1970) and *King Radio Corp. v. United States,* 486 F.2d 1091, 1096 (10th Cir.1973) that indicates that whether the movable partitions involved in those cases "functioned" as walls was irrelevant in light of the fact that they were easily removable and thus qualified as "tangible personal property." This language is in complete accord with our analysis and the analysis of the Tax Court in this case. The initial determination in ITC cases is whether property is inherently permanent. Obviously, "functionality" is irrelevant to this inquiry as correctly noted by the *Minot* and *King Radio* courts.

■ Functionality is a useful inquiry, however, in many areas of ITC law. The *King Radio* court itself acknowledged that "function" was a useful test to determine whether or not property is a building or structural component. *King Radio,* 486 F.2d at 1096. The *Monk* court also applied functionality to determine whether a structure is a building. *A.C. Monk,* 686 F.2d at 1061. The separate requirement (not involved in this case) that property be utilized for a qualified use mandates a functionality approach. *See Sherley-Anderson-Rhea Elevator v. United States,* 315 F.Supp. 1055, 1058 (N.D.Tex.1970). The Commissioner himself admits that "functionality" remains as a useful factor in many areas of ITC analysis. He concedes functionality is commonly used to determine whether property is a storage facility specially qualifying for ITC treatment, whether property is a building, and whether property is machinery or equipment which also specially qualifies for ITC treatment. Appellant's Brief, pp. 20–21. In light of this widespread use, we see no reason to reject *Scott Paper's* use of functionality as a method of allocation when property only partially qualifies as accessory to a taxpayer's business.

■ The Commissioner's argument that there is no basis for partial ITC treatment of property is also without foundation for the reasons outlined above. Even *Monk* supports the allocation of ITC treatment among various components of a single electrical system. *Monk* simply prefers a part-by-part allocation approach to the exclusion of an allocation by percentage of use approach. We recognize that either approach may be useful and leave the choice of allocation method in the sound discretion of the trial court.

■ We now move to the question of whether the ninety-five percent of ICM's electrical distribution system, which is inherently permanent but which is also accessory to ICM's business and thus the type of other tangible property to be considered for ITC treatment, is a building. The Commissioner does not, and cannot, seriously contend that ICM's electrical system is itself a building. Its appearance is not that of a building, and it does not provide work space or otherwise function as a building.

The Commissioner does contend, however, that ICM's electrical distribution system is a structural component of a building. He asserts that all electrical systems are expressly included as structural components by the regulation's classification of "electric wiring and lighting fixtures" as examples of structural components. (*See* footnote 5, *supra*). He also asserts that whether property relates to the operation and maintenance of a building is not the proper test for whether property is a structural component of a building. We disagree and uphold the Tax Court's determination that the ninety-five percent of ICM's system powering mill machinery is not a structural component.

■ The phrase "electric wiring and lighting fixtures" does not include ICM's electrical distribution system. The Commissioner himself describes the system as composed of "circuit breakers, transformers, power panels, switchboards, motor control centers, *and associated wiring.*" Appellant's Brief, p. 4 (emphasis added). Clearly there is more to ICM's system than electric wiring alone. Both *Monk* and *Scott Paper* declined to adopt the Commis-

sioner's position that the phrase "electric wiring and lighting fixtures" disqualifies all electrical distribution systems from ITC treatment, and we also reject that position.

We also see no reason to depart from the language of the Commissioner's own regulation establishing the test for structural components by defining them as property "relating to the operation and maintenance of a building." Treas.Reg. § 1.48–1(e)(2). The Commissioner states that close examination of the regulatory language reveals that the examples preceding the phrase provide a "comprehensive definition of the term 'structural components,'" and "the phrase ['other components relating to the operation and maintenance of the building'] was intended to do no more than to amplify the idea that items peculiar to the taxpayer's business operations … would not be classified as 'structural components' even though they were permanently installed and would be classified as fixtures under local law." Appellant's Brief, pp. 14 and 24.

The Commissioner's proposed reading of the regulation is obviously strained, contrary to the case law, *See Scott Paper*, 74 T.C. at 183; *Central Citrus Co. v. Commissioner*, 58 T.C. 365, 373–74 (1972); *Ponderosa Mouldings v. Commissioner*, 53 T.C. 92, 95 (1969), and confuses the test for "structural components" with the test for "other tangible property." We also note that the Commissioner's reading results in ninety-five percent of ICM's system qualifying for ITC treatment anyway. If the examples listed in the regulation are indeed a comprehensive list of all structural components, we have already determined that ICM's electrical distribution system is not included in that list and would, therefore, not be disqualified from ITC treatment as a structural component.

### III.

In sum, we affirm the Tax Court's determination that ninety-five percent of the

cost of ICM's electrical distribution system qualifies as § 38 property eligible for the ITC. Although the system is inherently permanent, and thus not "tangible personal property" under § 48(a)(1)(A), the ninety-five percent of the system that powers ICM's machinery is "other tangible property" that is not a building or structural component of a building under § 48(a)(1)(B). To the extent that our holding approving the Tax Court's allocation of the ITC to ninety-five percent of the electrical distribution system is inconsistent with the holding in *A.C. Monk & Co. v. United States*, 686 F.2d 1058 (4th Cir.1982), we respectfully disagree with the Fourth Circuit's reasoning in that case.

The judgment of the Tax Court is hereby in all respects

AFFIRMED.