T.C. Memo. 1997-175


UNITED STATES TAX COURT


L.L. BEAN, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

L.L. BEAN, INC., LEON GORMAN, TAX MATTERS PERSON, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 16379-94, 16380-94.          Filed April 9, 1997.


<u>John S. Brown</u>, <u>Joseph L. Kociubes</u>, <u>George P. Mair</u>, <u>Donald-Bruce Abrams</u>, and <u>Matthew D. Schnall</u>, for petitioners.

<u>Maureen T. O'Brien</u>, <u>Melanie M. Garger</u>, and <u>Barry J. Laterman</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

RUWE, Judge:  In docket No. 16379-94, respondent determined a deficiency in L.L. Bean, Inc.'s (hereinafter petitioner) 1986 Federal income tax of $649,428.  In docket No. 16380-94, respondent issued a notice of final S corporation administrative adjustment (FSAA) to Leon Gorman, petitioner's president and tax matters person, setting forth the following disputed adjustments with respect to petitioner's 1987 taxable year:[1]

| Item | FSAA Adjustment | Amount in Dispute |
|------|-----------------|-------------------|
| Depreciation deduction | $1,375,273 | $608,037 |
| General business credit | 22,523 | 19,622 |

The sole issue for decision is whether petitioner is entitled to an investment tax credit (ITC) under section 38[2] with respect to certain property petitioner placed in service during the years in issue.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, first, second, and third supplemental

---

[1]Other adjustments set forth in the notice of final S corporation administrative adjustment are not in dispute.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

stipulations of facts, and stipulation of exhibits are incorporated herein by this reference. Petitioner is a Maine corporation with its principal place of business in Freeport, Maine. Petitioner is an accrual basis, calendar year taxpayer. For its taxable year ended December 31, 1987, petitioner elected under section 1362(a) to be taxed as an S corporation.

Petitioner is a retailer of outdoor sporting specialty goods, including both apparel and sporting equipment. Petitioner purchases merchandise from various vendors and manufacturers and sells merchandise principally through a nationwide and international catalog distribution system. Petitioner requires a substantial reserve inventory of merchandise, which is shipped to petitioner's distribution center located in Freeport, Maine.

As part of the expansion of its distribution center in 1986, petitioner placed in service a storage facility (the Reserve Facility) and a shipping building (the 1986 Shipping Building), which contains a mezzanine (the Mezzanine System).[3]

Reserve Facility

The Reserve Facility is a large storage facility which houses quantities of bulk merchandise in long rows of floor-to-ceiling racks. Petitioner began construction of the Reserve

---

[3]Only the Mezzanine System and the Reserve Facility are in issue here.

Facility in 1985 and placed it in service when construction was substantially completed in 1986.[4]

The Reserve Facility is approximately 500 feet long by 190 feet wide by 52 feet high. It is located immediately adjacent to the east side of two existing buildings (the Receiving Building and the 1979 Shipping Building) and is connected to both buildings at a mezzanine level 20 feet above the main floor of the Reserve Facility. This mezzanine extends along the north face of the Reserve Facility for a depth of 26 feet and continues along the west face of the Reserve Facility at a depth of 11 feet 8 inches. A concrete block boiler room is located on the main floor of the Reserve Facility below the north mezzanine level. In addition, there is a 25-foot-wide floor-level clear area at the south end of the Reserve Facility.

The Reserve Facility does not have a standard column grid that is typically used to support the roof and walls in a free-standing building. Instead, the structural system supporting most of the roof and walls of the Reserve Facility is the rack system. Frazier Industrial Co. (Frazier), a storage rack system manufacturer, participated in the design of, and provided the necessary engineering and materials for, the rack system and structural framework for most of the Reserve Facility. In order to save costs on structural steel, reduce labor costs, and

---

[4]Additional components of the Reserve Facility were placed in service in 1987.

increase storage efficiencies by eliminating interferences with dual structural systems, Frazier provided petitioner a storage rack system with increased structural capabilities. This enhanced structural rack system provides the support for the roof over the racks and for the east wall adjacent to the racks. These increased structural capabilities were accomplished by increasing the size of the vertical columns, increasing the amount of diagonal bracing on the end panels of the racks, and providing rigid connections where the shelves meet the support posts. Frazier also provided additional cross members at the roof to support the metal roof panels and additional supports to connect with the other structural elements.

Approximately 80 percent of the ground floor of the Reserve Facility is occupied by 19 rows of floor-to-ceiling storage racks, which are 446 feet long by 176 feet wide by 50 feet high, running north to south.[5] A typical rack row has vertical columns or posts 4 feet 8 inches from front to back (width) and 10 feet 2 inches apart (length). Each row of racks is separated from the next by an aisle which is 5 feet wide. The rack posts consist of steel channel posts with a C-shaped cross section. In some locations, at the lower end of a rack post, the channel section is made stronger by welding two channels together to form a rectangular cylinder. The upper and lower portions of each rack

_____

[5]Eighteen of the rows of racks are double-loaded.

post are spliced at approximately mid-height with a bolted connection, and each rack post is anchored to the floor of the Reserve Facility with anchor bolts. The front and back vertical rack posts are connected by L-shaped steel angles, which were welded to the rack posts prior to being delivered to the site. Diagonal angles welded between the two posts in an X-pattern prior to shipping create a rigid truss that provides lateral stability to the racks in the east-west direction.

The rack posts in each row are connected by horizontal beams, which span the 10-foot 2-inch distance between rack posts and also support the rack shelves and the roof deck. A typical shelf beam is 3 inches deep and 30 feet 6 inches long and connects to three rack posts. The shelf beams are connected to the rack posts with high strength steel bolts, creating a rigid connection that maintains a 90-degree angle between the rack posts and the beams and provides lateral stability to the racks in the north-south direction. While most of the rack shelves consist of wire mesh installed over the shelf beams, the bottom shelf consists of plywood with a metal skirt.

Petitioner's employees reach the rack shelves by using transtackers, which are customized vehicles that carry an operator and a load of merchandise at horizontal speeds up to 6.5 miles per hour both up and down the aisles and at vertical speeds up to 60 feet per minute from the bottom to the top of the

racks.[6]  Petitioner currently uses 10 transtackers in the Reserve Facility.

Each transtacker has a mast approximately 50 feet high, which guides the portion of the transtacker that carries the operator and load as it moves up and down from the bottom to the top of the racks.  At the top of the mast, two wheels follow a guide tube, which is mounted on a tie that spans the aisle and that is attached to the racks on each side of the aisle.  At the bottom, the transtacker is guided by a steel channel or track that is anchored to the floor by bolts in the center of the aisle.  The transtacker has lateral wheels that engage a flared steel guide to lead the transtacker onto the track when the operator directs it into an aisle from the south clear area.  The transtackers automatically slow down near the ends of the aisles and must be at ground level before a transtacker leaves an aisle. The transtackers can operate in the south clear area only when the cab is at floor level, since the mast is unstable without the guide rails.

The transtackers are powered by a dedicated electrical system installed at the top of each aisle.  The top of the transtacker mast carries four trolleylike "bus bar" contacts that draw electrical power from conductors mounted adjacent to the guide tube.  Outside of the aisles, in the clear area at the

_____

[6]Respondent has allowed petitioner an ITC for the transtackers, and those credits are not in issue in this case.

south end of the Reserve Facility, the transtackers are powered by self-contained batteries, which are charged with power drawn from the bus bar while the transtackers are in the aisles.

The concrete slab floor below the rack system is a minimum of 12.5 inches thick with two layers of reinforcing steel bars encased in the concrete.  The slab at the north and south end clear areas of the Reserve Facility is 8 inches thick.  The floor slab is extra thick under the racks to accommodate the load of the rack system.  A typical heavy duty warehouse floor slab is 5 to 6 inches thick.  However, a floor slab for a conventional building would require footings under the individual supporting structural columns.  These footings would be thicker than the floor slab, and the size and thickness of these conventional footings are determined by the column loads and soil characteristics of the site.

The top surface of the concrete floor slab under the racks was constructed with an F100 or "superflat" finish, which is smoother and more level than a conventional concrete floor.  The superflat surface is required for the efficient operation of the transtackers.  With a conventional concrete floor, variations in elevation in the floor under the transtacker wheels could cause a transtacker operating with the cab in an elevated position to

buck from side to side or from front to back, forcing the operator to run the transtacker at much lower speeds.[7]

Along the west wall of the Reserve Facility, there are two 30-foot-high masonry walls constructed of 12-inch-thick concrete blocks. This double masonry firewall separates the Reserve Facility from the distribution center along the northernmost 400 feet of the western side of the Reserve Facility. These walls are separated by a 7-inch air space, which would provide fire protection if either the Reserve Facility or the distribution center were to be consumed by fire. The remaining 100 feet of the west wall of the Reserve Facility, as well as the north, east, and south walls, are enclosed in a system of insulated metal wall panels. The wall panels are factory fabricated by a wall panel manufacturer and have a layer of sheet metal on either side of a foam insulation core. On the east and west sides of the Reserve Facility, the exterior wall panels are supported by horizontal I-beams, or girts, mounted on brackets that are attached directly to the racks. At the north and south end areas of the Reserve Facility, the wall panels and girts are partially supported by columns, varying from about 30 feet to 45 feet in height. Roof header beams at the top of these columns support part of the framing over the north and south end areas. The tops

---

[7]The transtacker manufacturer has modified its floor requirements for transtackers since petitioner completed the Reserve Facility.

of the columns and the header beams are connected to the racks by open web bar joists that stabilize the tops of the columns against wind loads and maintain rigidity. These columns are supported at the bottom by foundation walls, which vary in height to conform to the outside grade. The foundation walls of the Reserve Facility are poured-in-place, reinforced concrete, consisting of continuous footings and retaining walls. The wall panels are assembled from one end of the Reserve Facility to the other. Each panel is screwed to the girts with a reinforcing clip. All the joints are caulked between the panels and on the top and bottom girts. The ends and exposed edges of panels are finished with a preformed metal trim. Within the wall system are metal ventilation louvers, a 12-foot-wide by 14-foot-high rollup door, and several hollow metal swing doors and frames.

The Reserve Facility is covered by a roof that is directly connected to and supported by the racks. The Reserve Facility's roof consists of a 1.5-inch-deep corrugated metal deck supporting rigid insulation and a waterproof membrane roof. The roof membrane and the rigid insulation are held in place with stone ballast. Special flashing and trim pieces are used to terminate the membrane at mechanical equipment penetrations and around the perimeter of the roof. The metal deck is supported by beams that run across the top of the supporting rack posts. At the north and south ends of the Reserve Facility, the roof, which includes the deck, insulation, and membrane, is supported by open web bar

joists, which continue the line of the roof beams and span the distance from the last rack post to a header beam at the outside wall. Additionally, some of the Reserve Facility's mechanical and electrical systems are also supported by the rack system. Because of the structural support provided by the rack system, if it were removed, the roof would collapse and most, if not all, of the walls would fall.

An oil-fired boiler provides the heating source for the Reserve Facility. Water is heated in the boiler and circulated to various heating coils in the Reserve Facility. Eight customized rooftop ventilators, located throughout the rack area of the Reserve Facility, provide both heating and ventilation. In the summer, the ventilators draw air out, pulling air through the ventilation louvers, which are located on the north and south sides of the Reserve Facility, exhausting the warm air near the top of the Reserve Facility. In the colder months, the fan in the ventilator changes direction, drawing outside air from the top of the Reserve Facility through the ventilator cap and mixing it with return air from the top of the Reserve Facility in a plenum box. The return air is heated as it passes over the heating coils, and the mixed air is forced down a vertical plenum and distributed to the Reserve Facility at various levels through a series of diffusers in the plenum. Supplemental heating units are also located below the mezzanine floor. Six "upblast" rooftop ventilators provide additional ventilation capability, as

well as emergency smoke relief in the event of a fire. Thermostats in the Reserve Facility register temperatures in the 50 degrees Fahrenheit to 85 degrees Fahrenheit range. The Reserve Facility is not air-conditioned.

The Reserve Facility's electrical systems include lighting, power, alarm, and control systems. These systems are also integrated into the rack system. Conduits, fixtures, and junction boxes are supported by the racks and other structural elements of the Reserve Facility. The Reserve Facility uses a task-lighting approach, providing illumination only where required. The two open areas and the west mezzanine of the Reserve Facility have general illumination, while the rack system area is lighted with only minimal safety lighting, since the transtackers have their own lighting on the work platform.

The Reserve Facility also contains a fire protection system that conforms to National Fire Protection Association code requirements. The fire protection system is a wet, water-based, sprinkler system, which provides protection for the contents of the racks. The sprinkler system includes sprinklers at roof level, supported by the roof, and at two other intermediate levels supported by the racks. One intermediate level is located at approximately 18.5 feet above the floor, and the other is located at approximately 39.5 feet above the floor. These intermediate sprinkler levels are integrated into the racks, and there are plywood shelves immediately above those sprinkler

levels which act as fire baffles to trap the heat and activate the sprinkler heads.

The Reserve Facility was designed, and is used, for the storage and retrieval of merchandise in boxes. Merchandise arrives at petitioner's distribution center at the Receiving Building adjacent to the Reserve Facility. The merchandise is unloaded at the receiving staging area of the Receiving Building where petitioner's employees sort the boxes according to size. All boxes are tagged with a bar code for identification of the inventory therein and are banded and sent by conveyor to a pallet loading station in the 1979 Shipping Building. There, workers load the boxes onto pallets where they are delivered to the Reserve Facility or to other locations by forklift operators.

The boxes that are stored in the Reserve Facility are standard-sized boxes holding reserve merchandise inventory that is not required in petitioner's daily order picking, packing, and shipment operation. The boxes are stored in the Reserve Facility on the shelves of the storage rack system. Pallets holding boxes to be stored in the Reserve Facility are placed on "loading" conveyors located at the end of every other rack aisle on the Reserve Facility's mezzanine. Each pallet is then loaded by a transtacker operator onto the platform of a transtacker using a mechanical device that is built into the transtacker.

To store boxes on the Reserve Facility's shelves, the transtacker operator visually searches the racks for empty

spaces, drives the transtacker to that location, and manually transfers one box at a time from the transtacker onto the empty rack shelf. The operator then uses a hand-held scanner to scan the bar code on the box and the bar code at the rack location where the box is being stored. This information is recorded in a computer so the location of the box and the merchandise therein is recorded and available for later retrieval.

When the merchandise stored in the Reserve Facility is needed in the picking and shipping area, it is retrieved from the racks by the transtacker operators and distributed to other areas of the distribution center. To accomplish this, a transtacker operator is given a list of boxes of merchandise to be removed from the Reserve Facility and their locations on the shelves. The transtacker operator drives the transtacker to each box's location, manually retrieves the box of merchandise from the shelf, and places the box on a pallet located on the transtacker platform. When the operator has retrieved the designated boxes, the operator drives the transtacker to the Reserve Facility's mezzanine where the pallet holding the retrieved boxes is transferred onto one of the "unloading" conveyors located at the end of every other rack aisle. A forklift operator then retrieves the pallet of boxes from the "unloading" conveyors and transports the pallet to one of the distribution center's shipping buildings.

On its 1986 return, petitioner claimed an ITC for the costs of the entire Reserve Facility. The ITC, totaling $698,068, was based upon $6,980,676 in costs. Respondent disallowed $513,179 of the ITC with respect to $5,131,785.28 of these costs. Petitioner also claimed an ITC of $26,710 with respect to $267,102.37 in additional costs associated with the Reserve Facility on its 1987 return. Respondent disallowed $19,622 of this ITC. In addition, petitioner claimed a deduction on its 1986 and 1987 returns for depreciation on the entire cost of the Reserve Facility based upon the accelerated 5-year useful life method under section 168(b)(1). Petitioner also claimed on its 1986 return an interest expense deduction for all interest accrued during the construction of the Reserve Facility. None of this interest was capitalized under section 189 by petitioner.

## Mezzanine System

The Mezzanine System consists primarily of lower level racks approximately 9 feet 6 inches high and a horizontal steel structure with plywood decking on top of the racks which creates an intermediate level between the two floors of petitioner's 1986 Shipping Building. Petitioner began construction of the Mezzanine System in 1985 and placed it in service in 1986 when construction was completed.

The design and the engineering for the 1986 Shipping Building were prepared by the architectural firm of Symmes, Maini

and McKee Associates, Inc. (SMMA). In its design and construction of the 1986 Shipping Building, petitioner anticipated the construction of the Mezzanine System. The 1986 Shipping Building is a two-story building measuring 221 feet by 364 feet. The general clear floor height from the first floor of the 1986 Shipping Building to the underside of the second floor is 17 feet 4 inches. The Mezzanine System occupies approximately 219 feet by 290 feet of area in the 1986 Shipping Building.

The Mezzanine System was designed for the site and consists of a series of "off-the-shelf" items supplied by vendors and assembled (with bolts and boltless connectors and some welded connections) at the site. On the first floor of the 1986 Shipping Building, cantilever shelving attached to the rack posts of the Mezzanine System is used to hold petitioner's merchandise. Along the periphery of the building, where the lower level racks are not immediately adjacent to the building walls, lightweight rolled steel frames are used to support the mezzanine level in place of the racks. On the mezzanine level, independent shelving units sit on the plywood decking. In addition to the shelving units, there are some desks, enclosed work areas, a wire-mesh fenced area (which is used for the storage of high value inventory), conveyors, and other equipment located on the mezzanine level. Electrical cables, ducts, communications cable, lighting fixtures, and sprinkler piping for the 1986 Shipping Building are connected to, or suspended from, the underside of

the Mezzanine System.  The 1986 Shipping Building has a concrete block enclosure on the first floor, which houses restroom facilities for petitioner's employees.  An employee break area, accessible from the mezzanine and connected by flooring, is located on top of this concrete block enclosure.

Four freight elevators are located near the center of the 1986 Shipping Building.  These elevators have stops at the first floor, mezzanine level, and second floor of the 1986 Shipping Building.  A separate elevator, or pallet lift, is located in the southeast corner of the 1986 Shipping Building and also has stops at the first floor, mezzanine level, and second floor.  One stairway next to the freight elevators provides access among the three levels of the 1986 Shipping Building.  Several other stairways provide access between the mezzanine level and the first floor, and there is one other stairway between the mezzanine level and the second floor.  The mezzanine level is also accessible from the adjacent 1979 Shipping Building through one interior doorway and one additional wall opening at the mezzanine level.

Conveyors pass through the mezzanine level from the second floor and from the 1979 Shipping Building.  These conveyors carry customer orders that are ready for shipment.  The conveyors also pass through openings in the masonry wall at the mezzanine level to the shipping platform on the north end of the 1986 Shipping

Building.  Some of the conveyors rest on and are partially supported by the mezzanine floor.

The ground-level racks, supporting columns, and stairways of the Mezzanine System are joined to the floor of the 1986 Shipping Building by bolts.  Except for certain utility and flooring connections, the sides of the Mezzanine System are not attached to the 1986 Shipping Building.  Instead, diagonal bracing is used to provide the required lateral support.  Consequently, the Mezzanine System does not rely on the 1986 Shipping Building structure (other than the floor) for support, nor does it provide support for the 1986 Shipping Building.  Use of this integrated storage and structural support system for the mezzanine floor level offers petitioner cost savings in reduced structural steel, reduced labor costs, and increased storage efficiencies.

The Mezzanine System is used to store merchandise for ready access and individual order picking in petitioner's distribution center.  In the order picking process, petitioner's employees collect or "pick" individual items of merchandise from merchandise stored on shelves in order to fill a specific customer order.  Merchandise is brought from other areas of petitioner's distribution center by forklift operators where pallets are either left on the first floor of the 1986 Shipping Building or sent up to a staging area on the mezzanine floor. Workers unload the pallets into carts and manually distribute the goods to specific locations on the Mezzanine's storage shelving.

Petitioner claimed an ITC for the cost of the Mezzanine System on its 1986 return. The ITC, totaling $169,706, was based upon $1,697,061.80 in costs associated with the components of the Mezzanine System.[8] Respondent disallowed this ITC in the amount of $60,985 with respect to $609,852.79 of these costs. In addition, petitioner claimed a deduction on its 1986 and 1987 returns for depreciation on the entire cost of the Mezzanine System based upon the accelerated 5-year useful life method under section 168(b)(1). Petitioner also claimed on its 1986 return an interest expense deduction for all interest accrued during the construction of the Mezzanine System. None of this interest was capitalized under section 189 by petitioner.

## OPINION

The issue for consideration is whether petitioner is entitled to ITC's under section 38 with respect to the costs of the Reserve Facility and the Mezzanine System to an extent

---

[8]Petitioner claimed an ITC on a Mezzanine System consisting of the following items: (1) Ground-level storage racks and cantilever shelving; (2) a horizontal steel structure joined to and mounted on the top of the ground-level racks; (3) plywood decking placed upon the horizontal structure that creates the mezzanine level; (4) additional racks and shelving rising from the mezzanine decking to a height of approximately 6 feet; (5) additional columns and beams; (6) four one-piece stairway units connecting the first floor to the mezzanine; and (7) lightweight rolled steel frames that support the plywood decking and framing at the northwest and southeast corners along the periphery of the Mezzanine System where there are no ground-level racks.

greater than that allowed by respondent.[9] The parties agree that if the Reserve Facility and/or the Mezzanine System, or any part thereof, are determined to be "section 38 property", as defined in section 48(a)(1), then petitioner is entitled to: (1) An ITC with respect to such section 38 property (or part thereof); (2) a 5-year depreciation schedule under section 168(b)(1) with respect to such section 38 property (or part thereof); and (3) a deduction under section 163 for interest accrued during the construction period with respect to such section 38 property (or part thereof). The parties also agree that if petitioner is not entitled to the ITC's, then it is entitled to: (1) Amortize interest accrued during the construction period over a 10-year period under section 189, and (2) depreciate the property (or part thereof) using a 19-year schedule.

Petitioner bears the burden of proving its entitlement to the claimed credit. See Rule 142(a); Uecker v. Commissioner, 81 T.C. 983, 998 (1983), affd. per curiam on another issue 766 F.2d 909 (5th Cir. 1985).

To qualify for an ITC, property must qualify as section 38 property, which is defined in section 48(a)(1) as follows:

---

[9]The investment tax credit was repealed by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 211(a), 100 Stat. 2085, 2166, effective (subject to transition rules) for property placed in service after Dec. 31, 1985. The property's status as transition property is not in dispute.

(1) In general.--* * * the term "section 38 property" means--

     (A) tangible personal property (other than an air conditioning or heating unit), or

     (B) other tangible property (not including a building and its structural components) but only if such property--

          (i)  is used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, or

    *     *     *     *     *     *     *

          (iii)  constitutes a facility used in connection with any of the activities referred to in clause (i) for the bulk storage of fungible commodities (including commodities in a liquid or gaseous state), or

Thus, section 48(a)(1) creates two distinct categories of section 38 property:  (1) Tangible personal property; and (2) other tangible property, other than a building and its structural components, but only if the property is used as an integral part, or used in connection with, one of the qualifying activities described in section 48(a)(1)(B)(i).  <u>Munford, Inc. v. Commissioner</u>, 87 T.C. 463, 475 (1986), affd. 849 F.2d 1398 (11th Cir. 1988).  Petitioner does not argue that the property in question constitutes other tangible property described in section 48(a)(1)(B).  Rather, petitioner asks us to hold that the Reserve

Facility and the Mezzanine System constitute tangible personal property within the meaning of section 48(a)(1)(A).

The term "tangible personal property" is defined in section 1.48-1(c), Income Tax Regs., as follows:

> any tangible property except land and improvements thereto, such as buildings or other inherently permanent structures (including items which are structural components of such buildings or structures). * * * Tangible personal property includes all property (other than structural components) which is contained in or attached to a building. Thus, such property as production machinery, printing presses, transportation and office equipment, refrigerators, grocery counters, testing equipment, display racks and shelves, and neon and other signs, which is contained in or attached to a building, constitutes tangible personal property for purposes of the credit allowed by section 38. Further, all property which is in the nature of machinery (other than structural components of a building or other inherently permanent structure) shall be considered tangible personal property even though located outside a building. * * *

Therefore, section 48(a)(1)(A), unlike section 48(a)(1)(B), generally excludes from its scope not only buildings, but also other inherently permanent structures and their structural components.

To determine whether property is tangible personal property, we must first determine whether that property is a "building" within the meaning of section 1.48-1(e)(1), Income Tax Regs. Loda Poultry Co. v. Commissioner, 88 T.C. 816, 824 (1987); Munford, Inc. v. Commissioner, supra at 477. The term "building" is generally defined as:

> any structure or edifice enclosing a space within its walls, and usually covered by a roof, the purpose of which is, for example, to provide shelter or housing, or to provide working, office, parking, display, or sales space.  The term includes, for example, structures such as apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores.  * * *  [Sec. 1.48-1(e)(1), Income Tax Regs.]

In determining whether a structure is a building for purposes of the ITC, the regulations and the case law examine both the appearance and the function of the structure.  Munford, Inc. v. Commissioner, supra at 479.  The appearance test, whether the structure looks like a building, generally requires a structure enclosing a space within its walls and covered by a roof.  Sec. 1.48-1(e)(1), Income Tax Regs.

A.  Reserve Facility

We have examined photographs, blueprints, and videotapes of the Reserve Facility and have considered the testimony of the witnesses.  The Reserve Facility is a structure of substantial dimensions that encloses space[10] surrounded by walls and covered by a roof.  See Yellow Freight Sys., Inc. v. United States, 538 F.2d 790, 796 (8th Cir. 1976); Munford, Inc. v. Commissioner,

---

[10]Petitioner argues that the Reserve Facility does not enclose space, but, rather, encloses almost nothing except for the storage rack system.  This argument ignores the obvious purpose for the racks; i.e., to allow petitioner to use the space within the Reserve Facility for the storage of its merchandise.

supra at 477; sec. 1.48-1(e)(1), Income Tax Regs.  Thus, we
conclude that the Reserve Facility resembles a building.

We must next consider whether the Reserve Facility functions
as a building.  The function test requires a determination as to
"whether the purpose of the structure at issue is a purpose
ejusdem generis to the purposes described by example in section
1.48-1(e)(1), Income Tax Regs."  Munford, Inc. v. Commissioner,
supra at 480 (citing Consolidated Freightways, Inc. & Affiliates
v. Commissioner, 74 T.C. 768, 795 (1980), affd. in part and revd.
in part on other grounds 708 F.2d 1385 (9th Cir. 1983)).  In
Illinois Cereal Mills, Inc. v. Commissioner, T.C. Memo. 1983-469,
affd. 789 F.2d 1234 (7th Cir. 1986), we stated that

> The definition in section 1.48-1(e)(1), Income Tax
> Regs., expressly includes as "buildings" factory and
> office buildings where human activity may normally be
> expected to be of great importance; it also expressly
> includes as "buildings" warehouses, barns, and
> structures providing parking spaces, where human
> activity may be of little or no importance.  The courts
> have considered the matter of human activity, sometimes
> in terms of the nature of the human activity and
> sometimes in terms of the quantity and quality of human
> activity in the structure.  * * *

Therefore, in applying this test, a major focus of inquiry has
been whether the structure provides working space for employees
that is more than merely incidental to the primary function of
the structure.  This requires consideration of both the quantity
and quality of the human activity within the structure.  Id.

Petitioner asserts that the primary function of the Reserve Facility is the efficient storage and retrieval of its inventory. Petitioner contends that the activities of its employees in the Reserve Facility are merely ancillary to this function. Relying on Munford, Inc. v. Commissioner, supra at 484-485, and cases cited therein, petitioner argues that this Court has repeatedly held that the storage and removal of goods by employees is not the type of work or activity that is necessary to categorize a facility as a building. We disagree.

Contrary to petitioner's interpretation, we do not examine the type of employee activity in a vacuum. Rather, the activity must be examined in relation to the "nature of the business venture housed within that structure." Valmont Indus., Inc. v. Commissioner, 73 T.C. 1059, 1073 (1980); see also Sunnyside Nurseries v. Commissioner, 59 T.C. 113 (1972). The primary function of the refrigerated structure at issue in Munford was to "[maintain] sub-zero temperatures to prevent the spoilage of frozen foods." Munford, Inc. v. Commissioner, 849 F.2d at 1404. The activities of the employees in Munford were limited in both scope and duration due to the cold temperature of the refrigerated structure. Munford, Inc. v. Commissioner, 87 T.C. at 483. Therefore, despite the fact that employees routinely moved goods into and out of the structure, we held that this activity was merely incidental to the specialized purpose of the

structure at issue and, thus, the structure was not a building. Id. at 484-485.

Moreover, the cases cited in Munford involved specialized structures that are distinguishable from the Reserve Facility in this case. In those cases, the Court's ultimate inquiry was what functions the particular structures served. Merchants Refrigerating Co. v. Commissioner, 60 T.C. 856 (1973); Central Citrus Co. v. Commissioner, 58 T.C. 365 (1972); Catron v. Commissioner, 50 T.C. 306 (1968). In all of those cases, we found that the buildinglike structures functioned as more than mere storage facilities. See, for example, Catron v. Commissioner, supra, where the refrigerated area of a large Quonset-like structure was used for the cold storage of apples; Merchants Refrigerating Co. v. Commissioner, supra, where a large freezer room was used for the storage of frozen foods; and Central Citrus Co. v. Commissioner, supra, where atmospherically controlled "sweet rooms" were used to ripen fruit.

We find that, unlike the structures in Munford and the cases cited therein, human activity is essential, rather than merely incidental, to the function of the Reserve Facility. Petitioner agrees that the function of the Reserve Facility is to facilitate the storage and retrieval of merchandise. Similarly, the primary function of a typical warehouse is also the storage and retrieval of merchandise. However, petitioner attempts to avoid characterizing the Reserve Facility as a warehouse based on its

innovative design and construction. While we recognize that the design and the construction of the Reserve Facility may be innovative, the primary function of the Reserve Facility is not different from the quintessential function of any other warehouse; it is simply more efficient at that function. Like any typical warehouse, the Reserve Facility's function is accomplished primarily by the efforts of petitioner's employees who work in the facility since the merchandise is not stored and retrieved by the structure itself. See Yellow Freight Sys., Inc. v. United States, 538 F.2d at 796. Therefore, we find the activities of petitioner's employees to be of sufficient magnitude to compel a finding that the human activity inside the Reserve Facility is not merely incidental to its primary purpose.

Moreover, section 1.48-1(e)(1), Income Tax Regs., states that the term "building" includes, for example, warehouses. The House report accompanying the Revenue Act of 1962, Pub. L. 87-834, 76 Stat. 960, also lists a warehouse as an example of a building.

> Buildings and structural components thereof are not eligible for the credit. The term "building" is to be given its commonly accepted meaning, that is, a structure or edifice enclosing a space within its walls, and usually covered by a roof. It is the basic structure of an improvement to land the purpose of which is, for example, to provide shelter or housing or to provide working, office, display, or sales space. The term would include, for example, the basic structure used as a factory, office building, warehouse, theater, railway or bus station, gymnasium,

or clubhouse. * * *  [H. Rept. 1447, 87th Cong., 2d
Sess. (1962), 1962-3 C.B. 405, 516; emphasis added.]

In light of Congress' expressed intentions, and because we
find that the Reserve Facility functions essentially as a
warehouse and the human activity involved therein is not merely
incidental, we hold that the Reserve Facility is a building.

Petitioner contends that even if the Reserve Facility
resembles a building and functions as a building, it is not an
improvement to land because it is movable.  In cases involving
the issue of movability, we have approached the question of
whether the property was tangible personal property by
determining whether the structure was "inherently permanent".
Moore v. Commissioner, 58 T.C. 1045, 1052 (1972), affd. 489 F.2d
285 (5th Cir. 1973); Fox Photo, Inc. v. Commissioner, T.C. Memo.
1990-348.  Whether property is inherently permanent depends upon
the fashion in which it is affixed to the land and whether it is
designed to remain permanently in place.  Everhart v.
Commissioner, 61 T.C. 328, 330 (1973).  In making our
determination as to whether the Reserve Facility is inherently
permanent, we shall consider the six-part test articulated in
Whiteco Industries, Inc. v. Commissioner, 65 T.C. 664, 672-673
(1975):

     (1)  Is the property capable of being moved, and
has it in fact been moved?  * * *

(2) Is the property designed or constructed to remain permanently in place? * * *

(3) Are there circumstances which tend to show the expected or intended length of affixation, i.e., are there circumstances which show that the property may or will have to be moved? * * *

(4) How substantial a job is removal of the property and how time-consuming is it? Is it "readily removable"? * * *

(5) How much damage will the property sustain upon its removal? * * *

(6) What is the manner of affixation of the property to the land? * * *

Petitioner's argument that the Reserve Facility is not inherently permanent rests primarily on evidence that a similar structure has been moved. Petitioner presented evidence that R.R. Donnelley & Sons Co. (Donnelley) moved a structure with a design similar to the Reserve Facility. The evidence shows that this structure was disassembled, moved approximately 350 feet, and reassembled. This entire process took approximately 3 months. The relocation of the Donnelley facility did not include the concrete foundation.

The proper application of the Whiteco factors, however, rests on the premise that movability itself is not the key determinant of lack of permanence. See Everhart v. Commissioner, supra at 331 (holding that movability per se is not determinative as to whether property is personal or not). Almost any building or structure can be moved given ample time and manpower. See

Mallinckrodt, Inc. v. Commissioner, T.C. Memo. 1984-532, affd. 778 F.2d 402 (8th Cir. 1985). Therefore, the mere fact that the Reserve Facility is theoretically capable of being moved does not conclusively establish that it is not inherently permanent.

In the instant case, petitioner has failed to establish that either the design or the construction of the Reserve Facility indicates a lack of permanence. The Reserve Facility was specifically designed for the site as an addition to petitioner's distribution center. Construction of the Reserve Facility required extensive site work. The foundation for the Reserve Facility, which petitioner concedes cannot be moved, also involved considerable effort and expense. Moreover the materials used and the method of construction further indicate the permanent nature of the Reserve Facility. Finally, petitioner concedes that it has no plans to move the Reserve Facility and that the time and effort involved, if it were to move the structure, would be substantial. In light of the evidence presented, we find that the Reserve Facility is inherently permanent and thus an improvement to petitioner's land.

Relying on section 1.48-1(c), Income Tax Regs., petitioner nevertheless contends that the Reserve Facility is in the nature of machinery and qualifies as tangible personal property, notwithstanding the fact that it is an inherently permanent structure. See Munford, Inc. v. Commissioner, 87 T.C. 463 (1986); Weirick v. Commissioner, 62 T.C. 446, 451-452 (1974);

sec. 1.48-1(c), Income Tax Regs. Petitioner argues that the structural elements of the Reserve Facility are so closely related in design, construction, and function to the transtackers that they cannot realistically be treated as two separate groups of assets.

Petitioner's reliance upon section 1.48-1(c), Income Tax Regs., is based, in large part, on Weirick v. Commissioner, supra, in which we considered whether certain line towers and passenger ramps used in the operation of a ski lift were section 38 property. In Weirick, we held that the line towers were so affixed to the ground as to be considered inherently permanent structures. We also held that certain equipment attached to the line towers was property in the nature of machinery and that the line towers had no function other than supporting that equipment. The towers and the equipment were physically connected, and when it was necessary to replace the equipment, it was often as economical to replace the inherently permanent tower as well. Therefore, we decided that the line towers and the equipment were so closely related that they formed an integral mechanism which was property in the nature of machinery. Consequently, we held that the line towers were eligible for an ITC. However, we did not hold that the line towers were property in the nature of machinery merely because they were part of the ski lift. Rather, we based our holding upon the close relationship of the line towers to the attached equipment, which was itself property in

the nature of machinery.  With regard to the earthen passenger ramps in Weirick, we found that even if the entire ski lift were removed, the ramps would normally remain in place and thus were inherently permanent and did not qualify for an ITC.  Therefore, we declined to hold that the entire ski lift was property in the nature of machinery.  Weirick v. Commissioner, supra at 456.

A more revealing comparison may be drawn with the facts of Munford, Inc. v. Commissioner, 87 T.C. 463 (1986), in which the Commissioner allowed an ITC for certain refrigeration components, such as pipes and pipe insulation, valves, and motors, but disallowed an ITC for the structural elements of the refrigerated area including the foundation, footings, walls, floor, roofing and supports, vapor barrier, insulation, and electrical components allocable thereto.  The taxpayer in Munford argued that although the property in issue was an inherently permanent structure, it qualified as tangible personal property because it was in the nature of machinery, similar to the line towers in Weirick v. Commissioner, supra.  The taxpayer asserted that the structural elements of the refrigerated area operated together with the refrigeration system to make the refrigerated area function like one large refrigerator or freezer.

However, we held that the proper application of Weirick required us to focus on the individual structural elements of the refrigerated area rather than the facility as a whole.  In Munford, we found that the individual structural elements of the

refrigeration facility were not property in the nature of machinery, because those elements were fixed in place and did not serve a machinerylike function, and were not so closely related to other property as to be considered property in the nature of machinery. We recognized that if, when it became necessary to replace the equipment, it would have been as economical to replace the whole refrigeration facility, including the structural elements, as it would have been to replace only the equipment, we would have considered that fact an indication that the structural components and the refrigeration equipment were so closely related as to be considered property in the nature of machinery. The taxpayer in Munford, however, made no such showing. Munford, Inc. v. Commissioner, 87 T.C. at 495.

Moreover, we stated that if the purpose of the structural elements had been simply to support and assist the functioning of other property in the nature of machinery, we would have considered that fact as a further indication that the structural components and the machinery were so closely related that the structural components should be considered property in the nature of machinery. The structural elements in Munford however, served a function independent of the machinery, such as keeping out humidity, reducing temperature migration, and providing an enclosed, protected space in which frozen foods might be stored. Id. at 492-493.

Our inquiry in the instant case is thus not to consider whether the Reserve Facility as a whole constitutes property in the nature of machinery.  Rather, the question presented is whether the individual structural elements of the Reserve Facility qualify as property in the nature of machinery which is eligible for an ITC.  The structural elements of the Reserve Facility are fixed in place and are similar to the structural elements involved in Munford.  The transtackers, like the refrigeration equipment in Munford, are the only components of the Reserve Facility that could be considered to have a machinerylike function.  Petitioner has not shown that if it became necessary to replace the transtackers in the Reserve Facility, it would be as economical to replace the entire facility, including the structural elements, as it would be to replace only the transtackers.  Additionally, petitioner admits that the walls and the roof of the Reserve Facility have a function separate and apart from merely supporting the transtackers.  Petitioner concedes that the purpose of the roofing and wall panels connected to the racks is merely to protect petitioner's inventory.  Although the guide tubes and the electrical bus bars for the transtackers are attached to the racks, the primary purpose of the racks is not to support this equipment but, instead, to hold petitioner's merchandise and to support the roof and the walls that protect the merchandise. While the floor slab provides a smooth surface for the

transtackers, its primary purpose is to support the racks and other structural elements of the Reserve Facility. Consequently, as in Munford, the structural elements here have a function independent of supporting the machinery, which indicates that the structural elements are not so closely related to the machinery that they should be considered in the nature of machinery themselves. Id. at 492-493.

Nevertheless, petitioner contends that it is entitled to an ITC for the separate components of the Reserve Facility individually, which include: (1) The storage rack system; (2) the superflat concrete slab; (3) the roofing and the wall panels; and (4) miscellaneous systems (consisting of heating, ventilation, electrical, and fire protection systems). Respondent, on the other hand, contends that these individual items constitute inherently permanent structural components of the Reserve Facility and, therefore, do not qualify as section 38 property.

Section 1.48-1(e)(2), Income Tax Regs., explains the meaning of "structural components" mainly by illustration rather than by definition:

> The term "structural components" includes such parts of
> a building as walls, partitions, floors, and ceilings,
> as well as any permanent coverings therefor such as
> panelling or tiling; windows and doors; all components
> (whether in, on, or adjacent to the building) of a
> central air conditioning or heating system, including
> motors, compressors, pipes and ducts; plumbing and
> plumbing fixtures, such as sinks and bathtubs; electric

wiring and lighting fixtures; chimneys; stairs, escalators, and elevators, including all components thereof; sprinkler systems; fire escapes; and other components relating to the operation or maintenance of a building.  * * *

To the extent that any of the components relate to the overall operation and maintenance of the Reserve Facility, they are structural components of such and do not qualify as tangible personal property.  Scott Paper Co. v. Commissioner, 74 T.C. 137, 182-183 (1980).

### 1.  The Storage Rack System

The Reserve Facility does not have a standard column grid typically used to support the roof and the walls in a free-standing building.  Instead, the storage rack system is the structural support for the Reserve Facility.  Therefore, the storage rack system not only provides shelving for the storage of petitioner's merchandise; it also provides the primary structural support for the walls and the roof of the Reserve Facility.  Petitioner contends, however, that the support function of the storage rack system is secondary to that of providing racks and shelving for storage, and, therefore, the racks are not a structural component of the Reserve Facility.  Petitioner relies on Rev. Rul. 79-183, 1979-1 C.B. 44; Rev. Rul. 79-181, 1979-1 C.B. 41; and Rev. Rul. 74-391, 1974-2 C.B. 9, in support of its contention.

In Rev. Rul. 79-181, supra, the Commissioner determined that structural columns which were specifically designed to support 400-ton cranes and craneway structures were tangible personal property, because they functioned as part of the specific items of machinery with which they were associated.  The Commissioner determined that "Any function they may have as building components is strictly incidental to their essential function as a part of those items of machinery or equipment."  Rev. Rul. 79-181, supra, 1979-1 C.B. at 42.  Similarly, in Rev. Rul. 79-183, supra, the Commissioner determined that a foundation which was specially constructed to support several stamping presses was an essential part of that machinery.  Although the foundation also served as a floor, that use was "strictly incidental to the use that necessitated its special design."  Rev. Rul. 79-183, supra, 1979-1 C.B. at 45.  Likewise, in Rev. Rul. 74-391, supra, 1974-2 C.B. at 9, the Commissioner held that a raised false floor which was designed and constructed "only to provide access" for the installation and operation of computer equipment was essentially part of that equipment and not a structural component of the building.  Respondent has thus allowed an ITC for certain property which is essentially part of machinery or equipment, notwithstanding the fact that it has an incidental function as a structural component of a building or an inherently permanent structure.

Here, we have previously determined that the storage rack system does not function as part of a machine. Additionally, we find that the storage rack system provides more than a mere "incidental" structural support function. Even if structural support is not the "primary" function of the racks, it is certainly more than "incidental" to their other functions.

Moreover, the storage rack system is a permanent part of the Reserve Facility. It is the main structural support for the Reserve Facility, a structure that we have already found to be inherently permanent. Without the storage rack system, the roof and most of the walls of the Reserve Facility would collapse. Therefore, we find that the storage rack system is an inherently permanent structural component of the Reserve Facility and does not qualify as section 38 property.

## 2. Concrete Slab Floor

Petitioner maintains that the concrete slab floor is also an item of machinery because it was specially designed to support the storage rack system and the transtackers. In support of this argument, petitioner again relies upon Rev. Rul. 79-183, supra, and Rev. Rul. 79-181, supra, in addition to our determination in Texas Instruments, Inc. v. Commissioner, T.C. Memo. 1992-306, where we held that a specially designed floor was essential to the operation of the taxpayer's machinery, notwithstanding the fact that part of the floor was used for activities that did not

involve heavy machinery.  We stated in Texas Instruments that, to the extent that the component also served as a floor, "this use '[was] strictly incidental to the use that necessitated its special design.'"  Id. (quoting Rev. Rul. 79-183, supra, 1979-1 C.B. at 45).  In addition, we held that another floor in Texas Instruments was not tangible personal property, because "it was not so specially designed, constructed, or used to serve other qualifying property".  Id.

We note that the Reserve Facility's concrete slab floor is thicker than a conventional warehouse floor.  The thickness of the Reserve Facility's concrete slab floor is due primarily to petitioner's choice of structural support; i.e., the racks, which are not qualifying property.[11]  However, we do not find that the thickness of the concrete slab was essential to the operation of petitioner's transtackers, which are qualifying property.  Consequently, the function of the concrete slab floor as a structural component was not strictly incidental to its special design; rather, its function as a structural component of the Reserve Facility necessitated its special design.

Petitioner also argues that the concrete slab's special design is necessary for the efficient operation of the

---

[11]A conventional warehouse floor would require footings under the structural support columns.  These footings would be thicker than the rest of the conventional floor slab.  The size of the footings would depend upon the column loads and soil characteristics of the site.

transtackers.  The top surface of the concrete slab under the racks is constructed with an F100 or "superflat" finish, which is smoother and more level than a conventional concrete floor.  The concrete slab floor, although modified for design considerations, is still clearly a structural component of the Reserve Facility. Petitioner has provided no meaningful method to allocate any portion of the total expense of the concrete slab floor to the cost of the superflat finish.  Rule 142(a).

### 3.  Roof and Wall Panels

Petitioner contends that, even if the roof and the wall panels might otherwise constitute parts of a building, these items still qualify for an ITC under section 1.48-1(e)(1)(ii), Income Tax Regs., which excludes from the term "building":

> a structure which houses property used as an integral
> part of an activity specified in section 48(a)(1)(B)(i)
> if the use of the structure is so closely related to
> the use of such property that the structure clearly can
> be expected to be replaced when the property it
> initially houses is replaced.  * * *

Petitioner argues that the exception provided in section 1.48-1(e)(1)(ii), Income Tax Regs., applies here, because if the racks were to be replaced, the roof and the walls would also have to be replaced.  However, petitioner does not contend that it participates in any activity specified in section 48(a)(1)(B)(i). Rather, it argues that the same tests apply in determining

whether property is a building, regardless of whether the ultimate issue is whether the property qualifies under section 48(a)(1)(A) or (B). Petitioner relies upon L&B Corp. v. Commissioner, 88 T.C. 744, 760-761 (1987), revd. on other grounds 862 F.2d 667 (8th Cir. 1988), and Munford, Inc. v. Commissioner, 87 T.C. at 478 n.9, in support of this argument. Although these cases hold that the general definition of the term "building" is similar under section 48(a)(1)(A) and (B), the exception provided by section 1.48-1(e)(1)(ii), Income Tax Regs., specifically requires that the structure house property which is used as an integral part of an activity specified in section 48(a)(1)(B)(i). Neither L&B Corp. nor Munford undermines this requirement. Therefore, because petitioner does not participate in any activity specified in section 48(a)(1)(B)(i), this exception does not apply to the facts in this case. Consequently, the roof and the walls of the Reserve Facility are structural components in accordance with section 1.48-1(e)(2), Income Tax Regs.

4. Miscellaneous Systems

The remaining components of the Reserve Facility in issue are the electrical, heating, ventilation, and fire protection systems. While recognizing that these items are specifically included as examples of items which constitute "structural components" in section 1.48-1(e)(2), Income Tax Regs., petitioner insists that they do not "relate to the operation or maintenance

of a building".  Scott Paper Co. v. Commissioner, 74 T.C. at 183.

In Scott Paper Co. v. Commissioner, supra at 182-183, which

involved a claimed credit for electric wiring, we stated:

> Although we give great weight to respondent's
> regulations, it would be improper to read the words
> "electric wiring" in a vacuum and conclude that those
> electric cables, therefore, must be structural
> components.  Rather, the effect of the final element of
> that same subparagraph, which reads "and other
> components relating to the operation or maintenance of
> a building," must be taken into account.  That final
> element functions as a descriptive phrase intended to
> present the basic test used for identifying structural
> components.  The preceding elements are examples of
> items which meet that test as a general rule.  Items
> which occur in an unusual circumstance and do not
> relate to the operation or maintenance of a building
> should not be structural components despite being
> listed in section 1.48-1(e)(2), Income Tax Regs. * * *
> Accordingly, the critical test * * * is whether they
> [the electric wiring and fixtures] relate to the
> overall operation and maintenance of a building.
> * * *  [Fn. refs. omitted.]

See also Everhart v. Commissioner, 61 T.C. at 331; Ponderosa

Mouldings, Inc. v. Commissioner, 53 T.C. 92, 96 (1969).

In Scott, we held that "a logical and objective measure of

electrical load exists, allowing an allocation between the

structural and process functions which are served by the

electrical components."  Scott Paper Co. v. Commissioner, supra

at 185.  Based on this objective evidence, we held that the

components of a primary electrical system were tangible personal

property to the extent they provided power for the taxpayer's

process machinery, and we disallowed ITC's only for the

percentage of the system that was deemed to be used "to provide general building services".  Id. at 185-186.

Here, petitioner claims that 75 percent of the cost of the Reserve Facility's electrical system should be allocated to the electrical bus bar system for the transtackers.  However, petitioner has not produced evidence demonstrating the percentage of electrical load attributable to the transtackers. Petitioner's unsubstantiated claim that 75 percent of the cost of the electrical system is attributable to the transtackers does not satisfy the "logical and objective" measurement required under Scott Paper Co. v. Commissioner, supra.

In addition, petitioner argues that no portion of the electrical system provides "general building services" due to the unusual design of the Reserve Facility.  The fact that the design of the Reserve Facility may be unusual will not, by itself, prevent its electrical system from being defined as a structural component.  The electrical system provides general building services such as lighting and power and is, therefore, a structural component of the Reserve Facility.

Petitioner contends that the plumbing and the sprinkler systems are not structural components, since they are built into and integrated with the rack system and are not suitable for providing general building services.  Respondent maintains that the sprinkler system is listed as a structural component in the regulations and that its placement within the storage rack system

is necessary because the water could not reach the lower levels due to the intervening merchandise on the shelves.

In Ponderosa Mouldings, Inc. v. Commissioner, supra, the taxpayer argued that because of the fire hazard involved in the manufacture of its wood moldings, its sprinkler system should be considered as machinery necessary to its operation and not as a structural component, which is part of the operation or maintenance of the building. Id. at 95. We disagreed and held that the entire sprinkler system was a structural component. We find the facts in the instant case essentially similar to those in Ponderosa Mouldings. The sprinkler system here relates to the operation and the maintenance of the Reserve Facility and, thus, is a structural component not eligible for an ITC.

Petitioner contends that the heating system was designed to provide for the operation and the maintenance of the Reserve Facility's water-based sprinkler system and not for the comfort of petitioner's employees. Respondent argues that the heating system for the Reserve Facility is specifically excluded from the definition of "tangible personal property" under section 48(a)(1)(A). Section 1.48-1(e)(2), Income Tax Regs., defines heating systems as structural components unless the "sole justification" test is met.

> [T]he term "structural components" does not include
> machinery the sole justification for the installation
> of which is the fact that such machinery is required to
> meet temperature or humidity requirements which are

essential for the operation of other machinery or the processing of materials or foodstuffs. Machinery may meet the "sole justification" test provided by the preceding sentence even though it incidentally provides for the comfort of employees, or serves, to an insubstantial degree, areas where such temperature or humidity requirements are not essential." [Emphasis added.]

To satisfy the "sole justification" test, petitioner must establish that the heating system is machinery, the sole justification for the installation of which was to meet temperature or humidity requirements which are essential for the operation of other machinery. Sec. 1.48-1(e)(2), Income Tax Regs. Petitioner has failed to present sufficient evidence demonstrating that the sole justification of the heating system was essential for the operation of the sprinkler system. Furthermore, we have determined that the sprinkler system is not machinery but rather a structural component of the Reserve Facility. Therefore, the Reserve Facility's heating system is ineligible for an ITC.

B. The Mezzanine System

Petitioner also claimed an ITC for the costs of the Mezzanine System located on the ground floor of its two-story 1986 Shipping Building. The Mezzanine System occupies approximately 290 feet by 219 feet of the 1986 Shipping Building and consists of the following items: (1) Ground-level storage racks; (2) a horizontal steel structure joined to and mounted on

the top of the ground-level racks; (3) plywood decking placed upon the horizontal structure that creates the mezzanine level; (4) additional racks and shelving located on the mezzanine level;[12] (5) additional columns and beams; (6) four one-piece stairway units connecting the first floor to the mezzanine level; and (7) steel frames that support the plywood decking and the framing where there are no ground-level racks. Petitioner maintains that the Mezzanine System is not physically connected to the 1986 Shipping Building (other than the connections to the first floor of the building) and, therefore, cannot be a structural component of the 1986 Shipping Building. Furthermore, petitioner contends that the Mezzanine System's structural support was constructed using bolts and boltless connectors with a minimum of welded connections, which indicates that it was designed to be easily moved and not a permanent component of the 1986 Shipping Building.

Respondent argues that the Mezzanine System is inherently permanent and constitutes a structural component of the 1986 Shipping Building which does not qualify as section 38 property pursuant to section 48(a)(1)(A). In support of this contention, respondent maintains that the floor of the Mezzanine System relates to the maintenance and the operation of the 1986 Shipping

---

[12]The parties do not agree as to the extent, if at all, to which the costs of the racks and the shelving located on the mezzanine level are included in the actual costs of the Mezzanine System.

Building, since it provides access to other parts of the 1986 Shipping Building and the 1979 Shipping Building, it is used for the storage and picking of merchandise, and its underside provides support for electrical and communication cables, lighting fixtures, sprinkler piping, and ventilation ducts for the first floor of the 1986 Shipping Building.

In determining whether an item is a structural component of a building, the permanency of that component has been considered an important factor. In Metro Natl. Corp. v. Commissioner, T.C. Memo. 1987-38, we considered whether various items in the taxpayer's buildings were eligible for an ITC. We found that the structural components listed in section 1.48-1(e)(2), Income Tax Regs., share a common characteristic--reasonable permanency. Furthermore, we stated that "In the ordinary case, a building is planned, designed, and constructed with the expectation that the items listed in the regulation will remain in place indefinitely. They are usually integrated with the building during the construction phase and are permanent parts of the building."

An examination of the evidence in this case indicates that the Mezzanine System is a fully integrated structural component of the 1986 Shipping Building. The 1986 Shipping Building was planned and designed with the integration of the Mezzanine System in mind. On this issue, the testimony of petitioner's manager of Facilities, Planning, and Engineering, James R. Helming, is particularly revealing:

Q.    Was Symmes, Maini & McKee [the architectural designers for the 1986 Shipping Building] involved with the --

A.    They did not design the rack system or the mezzanine system.  We gave them a drawing of the rack system that we were going to install into the space so that they knew how to place their lighting, how to place their sprinklers, how to place their mechanical systems.

Q.    Okay.  They did design the lighting for the mezzanine, did they?  And incorporated it in the overall lighting plan of the building.

A.    That's correct.

Q.    And they did that for the electrical service.

A.    That's correct.

Q.    And they did that for the heating.

A.    Right.

Q.    And the ventilation.

A.    And, again, they were told at the initial design to plan capacity for the building, for the mechanical systems, the heating system and for the electrical system and for the sprinkler system, that, in the future, we would be adding the mezzanine level and that would require an additional level of lighting, an additional level of sprinklers, and an additional level of heat and ventilation.


Moreover, the construction and the integration of the Mezzanine System in the 1986 Shipping Building demonstrate the expectation that it would remain in place indefinitely. Electrical wiring, communications cables, sprinkler systems, and duct work for heating and ventilating are all attached to the Mezzanine System.  In addition, the four freight elevators

located near the center of the 1986 Shipping Building serve all building levels including a specific stop for the mezzanine level.  Finally, openings are constructed in the masonry walls of the 1986 Shipping Building to provide access to the mezzanine level from the adjacent 1979 Shipping Building.  Together, these factors indicate that the Mezzanine System is integrated with, and relates to, the operation or maintenance of the 1986 Shipping Building.

Nevertheless, petitioner contends that the Mezzanine System was designed to be flexible and that it will be removed in the near future to allow for changes in the operation of the 1986 Shipping Building.  The evidence, however, reveals that petitioner did not change the Mezzanine System in any significant manner during the 10 years following its installation.  Furthermore, petitioner estimates that the removal of the Mezzanine System components will take six to eight people a little over 1 month to accomplish.  However, this estimate did not account for the time and effort required to disconnect the electrical wiring, communications cables, sprinkler systems, and duct work connected to the Mezzanine System.  We find that the substantial time and effort involved in both the construction and potential removal of the Mezzanine System, as well as the degree of integration with the 1986 Shipping Building, further reflect the permanent nature of the Mezzanine System.

In view of the foregoing, we hold that the Mezzanine System is a structural component of the 1986 Shipping Building and, thus, not eligible for the ITC's in an amount exceeding that allowed by respondent.[13]

Decisions will be entered under Rule 155.

---

[13]Petitioner does not argue that the individual items of the Mezzanine System are eligible for an ITC separately, and there is no evidence in the record that would allow us to allocate any cost to individual components of the Mezzanine System.  We note, however, that respondent's notice of deficiency allowed a substantial portion of the ITC that petitioner claimed with respect to the racks in the Mezzanine System.